Roseann FISHER and Amy
Fisher, Plaintiffs,

v.

Glenn S. GOORD, individually and in his
official capacity as Acting Commission-
er and former Deputy Commissioner of
the New York State Department of Cor-
rectional Services,

Thomas A. Coughlin, III, individually and
in his official capacity as former Com-
missioner of the New York State De-
partment of Correctional Services;

Philip Coombe, individually and in his of-
ficial capacities as former Assistant
Commissioner and former Acting Com-
missioner of the New York State De-
partment of Correctional Services;

Anthony Annucci, individually and in his
official capacity as Deputy Commission-
er of the New York State Department of
Correctional Services;

Anginell Andrews, individually and in her
official capacity as Superintendent of
Albion Correctional Facility;

Gary Stevens, individually and in his offi-
cial capacity as Deputy Superintendent
of Albion Correctional Facility,

Robert Schwartz, individually and in his
official capacity as Sergeant of
Albion Correctional Facility;

Martin Kearney, individually and in his
official capacity as Acting Captain of
Albion Correctional Facility;

Gary Desalvo, individually and in his of-
ficial capacity as Correctional Officer
of Albion Correctional Facility,

Frederick Hemley, individually and in his
official capacity as Correctional Officer
of Albion Correctional Facility;

Ira Stiles, individually and in his official
capacity as Correctional Officer of
Albion Correctional Facility;

Michael Galbreath, individually and in
his official capacity as Sergeant of
Albion Correctional Facility;

Brian Malone, individually and in his offi-
cial capacity as Inspector General of the
New York State Department of Correc-
tional Services;

Barbara D. Leon, individually and in her
official capacity as an Investigator for
the Inspector General of the New York
State Department of Correctional Ser-
vices;

D.A. Schmidt, individually and in his offi-
cial capacity as Correctional Officer
of Albion Correctional Facility;

Bruce Kuttner, individually and in his of-
ficial capacity as Correctional Officer
of Albion Correctional Facility;

Richard (Rick) Shimley, individually and
in his official capacity as Correctional
Officer of Albion Correctional Facility;

Mark Taylor, individually and in his offi-
cial capacity as Correctional Officer of
Albion Correctional Facility; and

Dino Thomas, individually and in his offi-
cial capacity as Correctional Officer of
Albion Correctional Facility, Defen-
dants.

No. 96–CV–0486A.

United States District Court,
W.D. New York.

July 16, 1997.

142

Glenn Edward Murray, Buffalo, NY, Thomas T. McVann, Westhampton Beach, NY, for Plaintiffs.

William Lonergan, Asst. Atty. Gen., Buffalo, NY, Andrew Lipkind, Williamsville, NY, Patrick B. Curran, Damon & Morey, Buffalo, NY, Robert C. Mulvey, Ithaca, NY, Brian J. O'Donnell, Rowley, Forrest, O'Donnell & Beaumont, Albany, NY, Mark D. Grossman, Niagara Falls, NY, Richard J. Barnes, Morris, Cantor, Barnes & Goodman, Buffalo, NY, Corey Hogan, Corey J. Hogan & Associates, Amherst, NY, Cheryl Smith Fisher, Buffalo, NY, Denise O' Donnell, Acting U.S. Atty., Buffalo, NY, Lawrence J. Vilardo, Mark Richard Uba, Connors & Vilardo, Buffalo, NY, Mark R. Walling, Watson, Bennett, et al., Buffalo, NY, Brian J. O'Donnell, Rowley,

Forrest, O'Connell & Beaumont, Albany, NY, Kevin S. Casey, Hite & Casey, Albany, NY, Michael Sawicki, Buffalo, NY, for Defendants.

## DECISION AND ORDER

ARCARA, District Judge.

### *INTRODUCTION*

On July 18, 1996, plaintiffs, Amy Fisher ("Fisher"), an inmate at the Albion Correctional Facility ("Albion"), and her mother Roseann Fisher ("Mrs.Fisher"), commenced this action in the Eastern District of New York. The case was subsequently transferred to this Court.

Plaintiffs allege that, while Fisher has been incarcerated in Albion, she has been raped and sexually abused by several correction officers. They claim that they complained about the correction officers' conduct to various officials in the New York State Department of Correctional Services ("DOCS"), but their complaints were not acted upon, and Fisher was, in fact, retaliated against as a result of the complaints. Plaintiffs' complaint asserts claims under the Civil Rights Act of 1871, 42 U.S.C. § 1983; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a); the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. § 651 *et seq.;* the Copyright Revision Act of 1976, 17 U.S.C. § 101 *et seq.;* the New York State Constitution; N.Y. Exec. L. § 290; and the New York common law. Plaintiffs seek compensatory and punitive damages, declaratory judgment and injunctive relief.

1. In the complaint, defendant DiSalvo's name is incorrectly spelled as "DeSalvo."

2. In the complaint, defendant Schmidt is listed as "D.A. Schmidt."

3. In the complaint, defendant Thomas' first named is incorrectly spelled as "Dino."

4. The complaint also listed as defendants "Correctional Officer Matthews," "Lt. Winters" and Correctional Officer Zamniak. Plaintiffs, however, were unable to locate and serve "Correctional Officer Matthews" and "Lt. Winters" and agreed to their dismissal, without prejudice. *See* Item

The defendants in this case are Glenn S. Goord, the Acting Commissioner of DOCS and former Deputy Commissioner; Thomas A. Coughlin, III, former Commissioner of DOCS; Philip Coombe, former Assistant Deputy Commissioner and Acting Commissioner of DOCS; Anthony J. Annucci, Deputy Commissioner and Counsel of DOCS; Anginell Andrews, Superintendent of Albion; Gary Stevens, Deputy Superintendent of Albion; Brian Malone, Inspector General ("IG") of DOCS; Barbara D. Leon, an IG investigator; Martin Kearney, Acting Captain at Albion; and Robert Schwartz, Gary DiSalvo,[1] Frederick Hemley, Ira Stiles, Michael Galbreath, Dean A. Schmidt,[2] Bruce Kuttner, Richard Shimley, Mark Taylor, and Dean Thomas,[3] all of whom are present or former correction officers at Albion.[4]

After the case was transferred to this Court, plaintiffs moved for a temporary restraining order ("TRO"), pursuant to Fed. R.Civ.P. 65, requiring the defendant prison officials to surrender Fisher to the United States Marshal for the Western District of New York for the purpose of transporting her to the Danbury Federal Correctional Institution in Danbury, Connecticut ("Danbury"), where she would be incarcerated during the pendency of this litigation.[5] Oral argument was held on the TRO motion on July 26, 1996. The Court denied the motion orally from the bench and scheduled a date for a preliminary injunction hearing.

On August 9, 1996, plaintiffs filed their motion for a preliminary injunction, seeking: (1) an order requiring that Fisher be transferred to Danbury during the pendency of this action; and (2) an order requiring defendant Kuttner to provide a blood sample. Be-

No. 83. Defendant Zamniak has been dismissed from the action pursuant to a stipulation of the parties. *See* Item No. 82. Hereinafter, the Court will refer to defendants Goord, Coughlin, Coombe, Annucci, Andrews, Stevens, Malone, Leon and Kearney, collectively, as the "defendant prison officials," and to defendants Schwartz, DiSalvo, Hemley, Stiles, Galbreath, Kuttner, Shimley, Taylor, and Thomas, collectively, as the "defendant correction officers."

5. Plaintiffs also moved for a TRO in the Eastern District, but Judge Joanna Seybert decided to transfer the case instead. *See* Item Nos. 2, 3 and 4.

cause plaintiffs had problems effecting service upon all the defendants, the original date for the preliminary injunction hearing had to be adjourned. Plaintiffs subsequently reported to the Court that they had not effected service on defendant Kuttner, but agreed to proceed with the preliminary injunction hearing on the condition that Kuttner would not be bound by any injunction issued.[6]

In light of plaintiffs' request that the Court order Fisher transferred to a federal correctional facility, and because neither the United States nor the Federal Bureau of Prisons ("FBP") is a named party in this action, the Court contacted the United States Attorney's Office and alerted it to the situation. The United States requested and was granted permission to appear *amicus curiae*. The United States argues that the relief requested by plaintiffs, *i.e.*, transfer to a federal facility pending resolution of this case, is improper and contrary to 18 U.S.C. § 3626(a), because the prospective relief extends further than necessary to correct the alleged wrong. The United States also argues that the Court lacks authority to order FBP to accept a state prisoner into its custody under the circumstances present here.

In response to the position of the United States, plaintiffs argue, *inter alia*, that 18 U.S.C. § 3626 is unconstitutional. Accordingly, pursuant to 28 U.S.C. § 2403, the Court has issued an order allowing the United States to intervene regarding the question of the constitutionality of 18 U.S.C. § 3626. However, because the Court's decision on the instant motion is not based on 18 U.S.C. § 3626, the Court has not required, up to this point, any additional briefing on the issue of the constitutionality of the statute.

The Court held a hearing on plaintiffs' preliminary injunction motion on September 24, 25, 26, 27 and 30, and October 21, 22 and 23, 1996. In addition to the evidence offered at the hearing, the parties offered various affidavits and exhibits. Following the hearing, the parties were given an opportunity to brief their respective positions, and oral argument was held on December 3, 1996.

After carefully considering the evidence adduced at the hearing and the various affidavits and exhibits, reviewing the submissions of the parties, and hearing argument from counsel, the Court denies plaintiffs' motion for a preliminary injunction. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

## FINDINGS OF FACT

### I. General Background

Plaintiff Amy Fisher is currently an inmate at Albion, serving a sentence of five to fifteen years for assault in the first degree. The criminal case resulting in her incarceration received extensive media coverage, which resulted in Fisher, herself, attaining significant notoriety.

Albion is a women's medium security facility located in Albion, New York, about midway between Buffalo and Rochester. Fisher has been housed at Albion since December 1992, except for two brief periods when she was transferred to the Bedford Hills Correctional Facility ("Bedford Hills"), located in Westchester County, so that she could attend other court proceedings downstate.

Fisher claims that throughout the time she has been incarcerated at Albion, she has been raped and sexually abused by several of the defendant correction officers. She claims that she complained about her treatment to DOCS authorities, including the Superintendent at Albion and the DOCS IG, but they took no action on her complaints and, in fact, retaliated against her by confining her in Albion's special housing unit ("SHU").

In general, defendants deny Fisher's allegations of rape and sexual abuse. Defendants Galbreath, DiSalvo, and Hemley have submitted sworn affidavits denying Fisher's allegations of rape and sexual abuse. Defendant Schwartz testified at the hearing that he never had any sexual relations with

---

**6.** Defendant Kuttner was eventually served after the preliminary injunction hearing was completed. His counsel and plaintiffs' counsel have entered into a stipulation withdrawing that portion of the preliminary injunction motion, seeking for a blood sample from Kuttner and agreeing to deal with that issue during the ordinary course of discovery. *See* item No. 122.

Fisher. The defendant prison officials deny that Fisher was placed in SHU for retaliatory purposes, and claim instead that Fisher was initially placed in SHU for disciplinary reasons after she violated a rule of inmate behavior by sending "love letters" to a correction officer, and that she was placed in involuntary protective custody ("IPC") in SHU following her disciplinary confinement in order to protect her from other inmates.

## II. *Plaintiffs' Witnesses* [7]

### A. *Hearing Testimony of Amy Fisher* [8]

#### 1. *Schwartz*

Plaintiff Amy Fisher testified that she arrived at Albion in December 1992. Hearing Transcript ("T.") 12. About two weeks after her arrival, she first met defendant Schwartz, who was a sergeant at Albion. T. 8. She testified that Schwartz called her to the grievance office in B block, introduced himself, and told her he wanted to talk to her. T. 12–13. Fisher testified that Schwartz was "very nice" and asked her how she was getting along at Albion. T. 12–13.

Fisher testified that, initially, she talked to Schwartz only about once or twice a week, but as things progressed, she got to know him better and they talked every day. T. 14. She testified that Schwartz spoke to her about the relationship between inmates and correction officers, and told her that "it's always good to have friends wherever you go and, you know, that he's my friend and that he wants to make sure that I'm all right. And, if I have a problem, to come to him." T. 14. She stated that Schwartz told her that she would have to behave and cooperate, and that if she did not, the correction officers would not help her or protect her from other inmates. T. 15.

Fisher testified that Schwartz told her about misbehavior reports (called "tickets") and that if she were to get a number of tickets, the parole board would not grant her parole. T. 16–17. She said that he explained to her that "the system is like a game, and if you play their game, you'll go home, if you buck the system or you don't

cooperate and play their game, they keep you longer and they may make your life miserable while they're keeping you. They don't protect you." T. 17.

Fisher testified that for about five or six months, Schwartz was "just [her] friend." T. 17. She thought he "was really nice" and she felt safe. T. 1 7. She testified that Schwartz took care of tickets she received from other correction officers and resolved problems she had with other correction officers. T. 1 7–18. Fisher testified that, during this five or six-month period, she had no sexual contact with Schwartz. T. 19. She further testified, however, that in the summer of 1993 she had sexual relations with Schwartz on two or three occasions in the administration building at Albion. T. 19.

While testifying, Fisher never used the word "rape" to describe her sexual interactions with Schwartz. She also never stated that Schwartz forced, threatened or coerced her to have sex with him. Nor did she state that she refused to have sex with him, or that she told him no. In fact, she admitted that she did not resist Schwartz. T. 249–50. She never tried to fight him off, scream or yell. T. 21.

Fisher testified that, in September 1993, she was transferred to Bedford Hills, and returned to Albion at the end of November 1993. T. 21. When asked whether she had any further physical contact with Schwartz after returning from Bedford Hills, she answered, "I can't even answer honestly. I don't remember. I don't know why I don't know. I just don't." T. 22. Fisher testified that her relationship with Schwartz changed after she returned from Bedford Hills. T. 22. She tried to distance herself from him by not talking to him or being friendly toward him. T. 22–23. She testified that Schwartz initially expressed concern, but then became jealous and asked her if she was involved with another correction officer. T. 23. She testified that Schwartz would pull her hair, make her talk to him, ask her if she loved him, scream at her, and make her

---

7. The testimony of the witnesses is discussed in the order in which they appeared at the hearing.

8. Plaintiffs also submitted an affidavit of Amy Fisher. *See* Item No. 9.

repeat over and over again "I love you, I love you, Bobby, things like that." T. 23. Fisher testified that this happened on more than one occasion and made her feel scared. T. 23–24. She testified that the reason she ended her relationship with Schwartz was because "when I was away from him I really—I didn't miss him." T. 24.

Fisher testified that, through her attorney, she reported Schwartz' conduct to officials at Albion. T. 24. She spoke to the DOCS IG in January 1994 and the next day Schwartz was transferred. T. 25. Fisher testified that after she complained in January 1994, "[her] life became unbearable and [she] didn't report anything again for quite a while." T. 176.

### 2. *Hemley*

Fisher testified that after she returned to Albion from Bedford Hills in November 1993, she had sexual relations with defendant Hemley, a correction officer at Albion, on three occasions. T. 29–37. The first time she had sexual relations with Hemley was at the end of November or the beginning of December 1993. She testified that Hemley came by her bed during the night, put his hand over her mouth and told her to be quiet. He then motioned to her to come with him and directed her to go into the staff bathroom. She testified that, once in the bathroom, Hemley started kissing her and "[she] ended up having sex with him." T. 29.

Fisher testified that the second occasion occurred in January 1994. T. 34. Once again, Hemley approached her during the night and they had sexual relations. T. 34–35. With regard to the second occasion, Fisher testified, "I don't know why I did it, I just did it because I did it. I didn't think about it. I didn't want to do it, but felt like—like I just—if I didn't do it, he wouldn't be my friend anymore." T. 36. Fisher testified that after the second occasion, she was "a little uncomfortable with it." T. 29.

Fisher testified that when she reported Schwartz to the DOCS IG in January 1994,

as discussed above, the IG asked her if she ever had sexual relations with any other correction officer and she told him "yes, Officer Hemley." T. 38. Fisher testified that she had sexual relations with Hemley a third time, on or about April 15, 1994. T. 36. She stated that she had sex with him because "[she] didn't know how to say no." T. 29.

While testifying, Fisher never used the word "rape" to describe her sexual interactions with Hemley. She also never stated that Hemley forced, threatened or coerced her to have sex with him. Nor did she state that she refused to have sex with him, or that she told him no. In fact, she admitted that she did not resist Hemley. T. 252–53. She did not try to fight Hemley off, scream or yell. T. 33. When asked why not, she responded, "[b]ecause he always acted like he was our friend and everything and I just—I liked it that he was my friend and, you know, he was there and he used to joke and play with us and I just—I don't know. I didn't know how to—like I just wanted him to be my friend." T. 34.

### 3. *Shimley*

Fisher testified that she first met defendant Shimley in 1993. T. 38. Shimley was the correction officer in charge of the gym at Albion during the day shift. T. 38. Fisher testified that, at first, Shimley "was really nice and polite." T. 60. She testified that at the end of 1994, or the beginning of 1995, Shimley showed her pictures of himself in which he was naked or semi-naked.[9] T. 51–53.

Fisher testified that her relationship with Shimley changed in about February 1995. T. 60. At that point, Shimley became angry with her. T. 57–60. Fisher testified that from February to May 1995, Shimley routinely called her names, such as "whore" and "slut," and exposed himself to her and asked her to perform sexual acts. T. 58–60. Fisher testified that in May or the beginning of June 1995, Shimley called her into the recreation office, grabbed her arm and tried to

---

**9.** Plaintiffs also attempted to introduce testimony that Shimley allegedly took suggestive photographs of Fisher, which they claim to have in their possession. Plaintiffs failed, however, to produce any such photographs prior to the hear-

ing or to include them on their exhibit list, despite the Court's Order that they do so. *See* Item No. 26. Accordingly, the Court excluded any testimony regarding the alleged photographs.

write on it with a permanent black marker. T. 47–48. She asked him what he was doing and he said he was going to "brand" her a "slut." T. 47. She then pulled away and left the area. T. 48.

Fisher testified that sometime in July 1995, she was required to report to the gym as part of a fire drill. T. 48. She had just gotten out of the shower and reported wearing only her bathrobe. T. 48. Fisher testified that Shimley walked up to her, grabbed her breast and "twisted it real hard." T. 48. Fisher also testified that in November 1995, Shimley kicked her in the shin. T. 62–63.

Fisher testified that she reported her problems with Shimley to prison authorities at Albion in the fall of 1995. T. 61–63. Her complaints were forwarded to the DOCS IG, and she spoke with IG investigator Leon about Shimley in December 1995. T. 61–63.

### 4. *DiSalvo*

Fisher testified that she first met defendant DiSalvo, a correction officer at Albion, in January 1993, when she was placed in protective custody in SHU. T. 65. She testified that while in SHU, DiSalvo kept coming to her door and demanding that she give him her autograph. T. 66. Fisher testified that when she refused, DiSalvo called her names and made sexual comments to her. T. 66. Fisher testified that she reported DiSalvo's conduct to prison authorities. T. 66.

Fisher testified that she did not see DiSalvo again until September 1994. T. 67. She testified that, at that time, she asked DiSalvo for a roll of toilet tissue so that she could cover the window to her cubicle while she was using the toilet, but DiSalvo refused and stared at her through the window while she was using the toilet. T. 68. Fisher testified that she told DiSalvo to leave her alone, but he told her that she had gotten him into trouble when she complained about his previous conduct in January 1993, and called her a "bitch." T. 69.

Fisher testified that, on October 14, 1994, she was raped by DiSalvo in a stairwell at Albion. T. 71–72, 253. She testified that she did not fight or scream, but did resist and told DiSalvo to stop. T. 72, 254. She testified that nobody else witnessed the incident.

T. 172. Fisher admitted that she never brought this incident to the attention of anyone at Albion or DOCS. T. 73. When asked why not, she stated "[b]ecause I told my attorney who was representing me at the time, because I was trying to bring about a lawsuit like this at that time." T. 73.

### 5. *Kuttner*

Fisher testified that she first met defendant Kuttner, a correction officer at Albion, in May 1993. T. 107. She testified that, on July 26, 1995, she had sexual relations with Kuttner. T. 108–09. She stated that she was

> joking around with Officer Kuttner and Officer Kuttner, he's always been, you know, flirtatious but he's always been all right, and he kept making sexual comments, this was going on for years and, you know, I would just laugh at him because it went on for years, I didn't really think anything of this and he told me to go into the bathroom ... I thought he was playing and I was calling his bluff and I did and he came in behind me and closed the door and he started kissing me and taking off my clothes.

T. 108–09. Fisher and Kuttner then had sex. T. 109–10.

While testifying, Fisher never used the word "rape" to describe her sexual encounter with Kuttner. She also never stated that Kuttner forced, threatened or coerced her to have sex with him. Nor did she state that she refused to have sex with him, or that she told him no. She testified that she did not try to stop Kuttner and never tried to fight him off, yell or scream. T. 109, 255. When asked whether she wanted to have sex with Kuttner, she testified, "[n]ot really, no, I was just, you know, he was joking with me and I thought it was a joke and I went in there and it wasn't a joke and I didn't know how to get out of it." T. 110. When asked whether she thought she could have fought him off, she responded, "I probably could have screamed or something, I don't know, I didn't think about it at the time." T. 110.

Fisher testified that she brought the incident regarding Kuttner to the attention of prison authorities at Albion in the beginning

of April 1996, approximately nine months after the incident occurred, and that a representative from the IG's office came to speak to her about the incident at the end of April 1996.[10] T. 110–11.

### 6. *Schmidt*

Fisher testified that she came to know defendant Schmidt while he was working as a correction officer at Albion. T. 111–12. Fisher testified that, at approximately 3:00 p.m. on April 8, 1996, she was ordered to go to the library to pick up legal mail. T. 11 5. She was told that the order came from Schmidt. T. 115.

Fisher testified that when she went to the library at 3:00 p.m. to pick up her legal mail, she was accompanied by inmate Lillian Nieves. T. 192, 296. Fisher testified that she and Nieves were good friends. T. 182, 297. They lived together, did everything together, talked together every day, and confided in each other. T. 181, 192. Fisher admitted that she told Nieves on numerous occasions that she wanted to get out of Albion, but denied telling Nieves that she had a "plan" for getting out. T. 181–82. Fisher did admit, however, that she had a "plan" to get out of Albion by filing a lawsuit. T. 182. Fisher also admitted that, on the way to the library, she and Nieves had a conversation, but denied that she ever discussed with Nieves a "plan" to "set up" Schmidt so that she could get out of Albion. T. 192–93. Fisher testified that Nieves was no longer her friend because Nieves had made up lies about her, manipulated the system for favors at Albion, and lied about her in a formal affidavit. T. 183.

Fisher testified that, when she arrived at the library at 3:00 p.m., Schmidt told her that he was busy and that she should return at 8:00 p.m. T. 11 6. Fisher testified that she returned to the library at 8:00 p.m., but Schmidt told her she would have to wait. T. 118. At approximately 8:30 p.m., Schmidt let all the other inmates, except Fisher, out of the library. T. 11 8–1 9. Fisher testified that she then asked Schmidt for her legal mail,

but he replied, "come on, you know you don't have any legal mail," and started making sexual comments to her. T. 119. Fisher testified that she tried to walk out of the library, but Schmidt grabbed her and stated that "it would be a shame" if he had to call-in and report that she was hiding in the library and tried to assault him. T. 120. Fisher testified that Schmidt then raped and sodomized her. T. 121, 256. Later that evening, after the incident, she spoke with Nieves about it. T. 295, 298–99.

When receiving legal mail, inmates are required to sign a log book. Although Fisher initially denied signing the log book on April 8, 1996, T. 272, she later admitted that she had signed the book. T. 274. *See* Defendants' Exhibit 13. Fisher testified that even though she signed the log book that day, she did not receive legal mail. She explained that she was "just playing around" when she wrote her name at the top of the page of the log book. T. 274, 281.

Fisher testified that she reported the incident involving Schmidt to prison authorities at Albion a few days after it happened.[11] T. 122, 202. She did not report the rape to Albion medical personnel. T. 203. Fisher testified that, in late April 1996, she spoke with IG investigator Leon about the incident. T. 123–24.

### 7. *Thomas*

Fisher testified that she first met defendant Thomas in March 1995. T. 128. He was the night-shift housing officer in her cell block. T. 128. Fisher testified that in September 1995, she awoke one night and found Thomas stroking her hair. T. 129. She found it irritating and told him to stop. T. 184–85. She testified that this happened again on a number of other occasions. T. 130. She further testified that at the end of December 1995, or possibly January 1996, Thomas came into her cubicle while she was asleep and began kissing her. T. 131–32. She stated that, at first, she did not realize

---

**10.** This appears to be at the same time she reported an incident involving defendant Schmidt that she alleges occurred in April 1996. This incident is discussed in more detail *infra*.

**11.** As stated *supra* note 10, at the same time she reported Schmidt, she reported the incident involving defendant Kuttner, which occurred nine months earlier.

what was happening and kissed him back until she finally woke up. T. 132. She testified that she never brought Thomas' conduct to the attention of anyone at Albion or DOCS. T. 133. Fisher testified that she was not scared of Thomas. T. 184.

### 8. *Bailey*

Fisher testified that shortly after arriving at Albion in 1992 or 1993, she met correction sergeant William Bailey.[12] T. 261. She testified that over the years they got to know each other better and became close in 1995. T. 262. She described their relationship as a "personal ... [and] loving friendship," but nonsexual. T. 262. Fisher stated that she wrote Bailey "many, many letters." T. 259. In particular, she admitted writing two letters to Bailey in May 1996, about one month after the incident involving defendant Schmidt, in which she expressed her strong feelings toward Bailey. T. 257, 260–61, 268, 300. *See* Defendants' Exhibit 4 at pp. 7–9. These letters are now in the possession of DOCS. T. 260. In one letter, dated May 1, 1996, Fisher states, "I miss you a lot [and] wish that you could be here with me. I'd make you lie down next to me so I could fall asleep on your chest." She states later in the same letter, "I love you Billy." Both letters are signed, "love me." The Court finds that these letters can best be described as "love letters" from Fisher to Bailey. Indeed, Fisher admitted at the hearing that she was in love with Bailey. T. 300.

### 9. *Other Complaints/Grievances*

Fisher testified that she was placed in disciplinary confinement in SHU from June 26, 1996 to August 26, 1996, for writing the love letters to Bailey.[13] T. 134–35, 268, 270,

300–02. While in disciplinary confinement in SHU, she was locked in her cell for 23 hours a day and was allowed only one hour a day of recreation outside. T. 135. She was allowed a shower every other day and her meals were provided to her in her cell. T. 1 35.

Fisher testified that, while she was in disciplinary confinement in SHU, she was not allowed to recreate with other inmates. T. 136–39. She testified that it was her experience that other inmates in SHU were allowed to recreate together. T. 137–39. She was told that Superintendent Andrews had ordered that she must recreate alone. T. 136, 138–39. She testified that her one hour of recreation was spent in a large recreation yard that all the other inmates in SHU were allowed to use, but at a different time. T. 139.

Fisher testified that she filed a formal grievance complaint, through the inmate grievance office, about the requirement that she recreate alone. T. 139. *See* Defendants' Exhibit 37. She testified that after she filed her grievance, she was no longer allowed to recreate in the large recreation yard, but was forced to use a smaller area behind her cell, and that she was still required to recreate alone. T. 139–40. Fisher testified that she filed another grievance regarding this same issue. T. 140. She testified that she eventually received a reply from Superintendent Andrews stating that the Superintendent felt that, due to Fisher's published allegations,[14] it was more prudent to have her recreate alone. T. 141.

Fisher testified that at the end of 60 days of disciplinary confinement, she was not re-

---

**12.** Bailey is not a defendant in this case.

**13.** The Court notes that, when Fisher was placed in disciplinary confinement in SHU, she was already serving a disciplinary sentence of 15 days in keeplock as a result of disobeying a direct order from a correction officer on June 12, 1996. Defendants' Exhibit 6. The Court further notes that, the day after the June 12th incident, Fisher made a request to be separated from staff and placed in voluntary protective custody ("PC"), claiming that: (1) she was scared of the staff; (2) she was being harassed by the staff; and (3) the June 12th incident was "planned" so that she would be placed in keeplock. Plaintiffs' Exhibit 12. Following an interview of Fisher by a coun-

selor, her PC request was denied by Superintendent Andrews. Plaintiffs have not argued in these proceedings that Fisher's punishment for the June 12th incident was motivated by retaliation or any other improper purpose, and there is no credible evidence to support such a contention. Indeed, Fisher herself did not even discuss the June 12th incident, or her subsequent PC request, during her testimony at the preliminary injunction hearing.

**14.** This was an apparent reference to statements attributed to Fisher in an article that appeared in *The New York Times Magazine* on July 21, 1996 (the *"Times"* article), which is discussed in more detail *infra*.

leased from SHU. T. 141. Instead, her status was changed to IPC and she remained in SHU. T. 141. Fisher testified that Captain Sherlock, a prison official at Albion, filled out an IPC form stating that other inmates in the general population could or would cause her harm. T. 141. While in IPC, Fisher was allowed one hour of recreation and two hours of television a day. T. 142. She was also allowed to have her personal property with her, including her clothes and cosmetics, and ten minutes a day for telephone calls. T. 142, 144. Fisher testified that, while she was in SHU, attempts were made by prison officials to tape record her telephone calls. T. 144–50. *See* Defendants' Exhibit 2 (Memorandum to Watch Commander from Correction Officer Hurcarella, dated September 4, 1996, describing unsuccessful attempt to tape record one of Fisher's phone calls). Fisher testified that while she was confined in SHU, she was denied virtually all human contact. T. 151. Fisher admitted, however, that while in IPC, she specifically asked not to recreate with the only other inmate in protective custody, inmate Figueroa. T. 312. *See* Defendants' Exhibit 28. Fisher explained that she did not want to recreate with Figueroa because Figueroa was a friend of Nieves, and she did not want to be placed in a position where Figueroa could say something about her that was not true.[15] T. 351.

Fisher testified that she was assaulted by other inmates at Albion on at least three occasions. On August 11, 1993, she was punched in the mouth by another inmate. On September 15, 1993, another inmate tried to strangle her in the phone room. On September 23, 1994, another inmate punched her while she was sleeping. T. 173–74.

**15.** At the time Fisher testified at the preliminary injunction hearing, she was still being held in IPC in SHU. However, after the hearing, she was returned to the general population. *See* Item No. 98.

**16.** Fisher also testified about an incident that occurred on the morning of September 25, 1996, when she was being transported to Court for the preliminary injunction hearing. She testified that while she was waiting for transportation, one of the defendants in this case, Michael Galbreath, stared at her through a glass window. She claims that this made her upset and, as a result, she vomited in the van on the way to Court. In response to this testimony, defendants

Fisher testified that in mid–1994, while at Albion, she received a tattoo on her right shoulder that says "Sexy." T. 203–04.

Fisher testified that she wants to be transferred to another correctional facility, regardless of its location.[16] T. 154–55.

After observing Fisher's demeanor while testifying, and carefully listening to and considering her testimony, the Court finds that she is not a credible witness. Many of her answers to simple, straightforward questions were evasive and nonresponsive. Her testimony was also inconsistent at times. For example, she initially testified that she was planning to bring a lawsuit as early as 1994. Later, however, she testified that she did not plan to bring a lawsuit until April or May 1996.

Fisher's testimony about the alleged rapes was uncorroborated. Plaintiffs did not present any other witnesses to the alleged rapes.[17] Nor did they offer any other physical evidence to support Fisher's testimony. Further, Fisher's testimony was contradicted in many important aspects by other witnesses, especially by Nieves, whom the Court found to be a credible witness.

In the Court's view, Fisher did not come across as someone who suffered a series of rapes. This view is based on a number of factors. First, Fisher's testimony regarding the rape allegations was very matter of fact and general in nature. Second, her descriptions of some of the sexual encounters, even if taken as true, could only reasonably be described as consensual. Third, at the same time Fisher was allegedly being sexually

presented the testimony of Sergeant Arlene Adamson, who was responsible for transporting Fisher to the courthouse on the day in question. She testified that: (1) Fisher was in Galbreath's line of sight for only about three minutes and during that time, she, Adamson, was talking to Galbreath; (2) it was almost an hour after the alleged incident before Fisher vomited; and (3) Fisher reported being nauseous on other days of the hearing as well. The Court finds this so-called "staring incident" to be insignificant.

**17.** The Court certainly realizes that there may not have been any other witnesses to some or all of the alleged rapes.

abused by correction officers at Albion, she received a tattoo saying "Sexy." Fourth, only a month after an alleged rape by a correction officer, Fisher was writing love letters to another officer. This conduct—receiving the tattoo and writing the love letters—would appear to be inconsistent with someone who was being raped and sexually abused by correction officers.

Simply put, the Court finds Fisher's allegations of rape to be highly suspect and unsupported by the record currently before the Court. The evidence tends to show that this lawsuit is part of a "plan" by Fisher to make false allegations against correction officers in order either to obtain a transfer out of Albion to a facility closer to home, or to assist her somehow in obtaining parole.

### B. Hearing Testimony of Dr. Charles Patrick Ewing [18]

Charles Patrick Ewing, Ph.D., was called as an expert witness by plaintiffs regarding Fisher's current mental state. Dr. Ewing is both a lawyer and a psychologist whose clinical practice consists primarily of doing evaluations of individuals who are involved in litigation and testifying as an expert witness. T. 316–17.

Dr. Ewing testified that, in preparation for his evaluation of Fisher, he "quickly" reviewed her medical records and proceeded to interview her. T. 320. Dr. Ewing only reviewed Fisher's medical records for the period of her incarceration and did not review any of Fisher's mental health records. T. 318–19. He interviewed Fisher on August 21, 1996, at Albion, for approximately three hours. T. 317, 320.

Dr. Ewing testified that he did a history and a mental status examination of Fisher. T. 320. He testified that Fisher related to him a history of being physically, sexually and psychologically abused as a child. T. 321, 325. She also related a history of having been a witness to many instances of domestic violence as she was growing up. T. 325. Fisher went on to relate the history of her relationship with a man that led to the

difficulties that she had with the law and her criminal acts. T. 325. She then related a history of being raped, sexually abused and sexually harassed at Albion. T. 325. Fisher told Dr. Ewing that many of her problems at Albion stemmed from her notoriety. T. 326.

Dr. Ewing testified that Fisher appeared to him to be depressed. T. 328. Fisher indicated to him that she does, from time to time, think of suicide, but has no immediate plans to kill herself. Fisher told him that unless she was moved from her present situation, that being disciplinary confinement in SHU, she would eventually take her own life. T. 328. Dr. Ewing candidly admitted, however, that he was not an expert in the area of the effects of solitary confinement. T. 329–30.

Dr. Ewing testified that his diagnosis of Fisher's clinical condition, at the time he interviewed her, was that of major depressive disorder. T. 333–34. Dr. Ewing testified that Fisher told him that she feared remaining in solitary confinement and that she would lose her mind and ultimately take her own life if she remained there. T. 334. Dr. Ewing also testified, however, that Fisher did not express to him any specific fears related to the things that allegedly happened to her at Albion. T. 334–35.

The Court does not find the testimony of Dr. Ewing to be persuasive. His opinion that Fisher suffered from major depressive disorder appeared to be based almost exclusively on his interview with Fisher. Unlike defendants' expert, Dr. Ciccone, Dr. Ewing failed to examine any of Fisher's numerous mental health records, which date back several years. Further, although Dr. Ewing testified that Fisher's depressed mental state was related to her confinement in SHU, he admitted that he was not an expert in the mental health effects of solitary confinement. The Court does not question Dr. Ewing's qualifications and skills, but nevertheless finds his opinion in this case to be less than thorough, because it was based only on a "quick" review of her medical records and a

---

**18.** The Court was provided with a copy of Dr. Ewing's notes of his interview of Fisher and a copy of his report.

three-hour interview, and not on a full review of her entire mental health history.

## C. *Hearing Testimony of Roseann Fisher* [19]

Plaintiff Roseann Fisher testified that she is the mother of plaintiff Amy Fisher. Mrs. Fisher lives in Merrick, New York, on Long Island. She testified that she first visited her daughter in Albion in December 1992. T. 389–90. She stated that in February 1993, she saw a television program showing footage of Fisher's living area at Albion. T. 390. The program also showed other inmates making threats against Fisher. T. 390. Mrs. Fisher said that she lodged a complaint about this incident through Fisher's attorney. T. 391, 393. She testified that she received a response from DOCS, stating that it was inappropriate to have allowed the television cameras into Fisher's living area, and that it would not happen again. T. 393.

Mrs. Fisher testified that in May 1993, she first met defendant Schwartz during a visit with Fisher at Albion. T. 393. She testified that she met Schwartz again in June 1993, when he invited himself to join them during a visit. T. 395.

Mrs. Fisher testified that, in the summer of 1993, Fisher told her for the first time that she had a sexual relationship with Schwartz. T. 494–95, 595. Fisher told her that when she first got to Albion, Schwartz befriended her and, eventually, the relationship progressed to the point where she had sex with him. T. 595. Mrs. Fisher testified that there came a point, however, when Fisher no longer wanted to continue the relationship. T. 596. Mrs. Fisher admitted that Fisher never used the word "raped" when describing her relationship with Schwartz. T. 596. Mrs. Fisher testified that Fisher told her that she was afraid of Schwartz because he had a bad temper, and that she felt trapped by Schwartz and could not get away from him. T. 597. Mrs. Fisher testified that she was furious when Fisher told her about her relationship with Schwartz. T. 598. She contacted her attorney and immediately for-

mulated a "plan" to get Fisher out of Albion. T. 491–94, 521, 598–99. She did not, however, at least at this point, contact or complain to anyone at Albion or DOCS about Schwartz. T. 521, 598.

Mrs. Fisher testified that Fisher was transferred from Albion to Bedford Hills at the beginning of September 1993, and that a few days later, she, Mrs. Fisher, received a telephone call from Schwartz. T. 398, 423–24. Mrs. Fisher testified that she never asked Schwartz to call her and was "surprised," "shocked," and "taken completely off balance" by his call. T. 399. Mrs. Fisher stated that, during this telephone call, Schwartz introduced himself, explained who he was, asked how Fisher was doing at Bedford Hills, and told her that he cared a great deal about Fisher. T. 399. Despite being "taken completely off balance," Mrs. Fisher tried to tape record this call, but was unsuccessful. T. 424, 438–39, 525.

Mrs. Fisher testified that she continued to receive telephone calls from Schwartz from September 1993 until just before Fisher was transferred back to Albion from Bedford Hills in mid-November 1993. T. 400. She stated that there were approximately twenty-two calls in all. T. 400. Mrs. Fisher testified that all the calls were initiated by Schwartz and that he always called her from a pay phone. T. 400. Mrs. Fisher testified that, during this time, she discussed the telephone calls with her attorney and received direction, guidance and instructions from him. T. 490, 532, 613. He told her it was a good idea to keep Schwartz calling and to tape record his calls. T. 554, 613.

Mrs. Fisher testified that she tape recorded several, but not all, of the telephone calls she received from Schwartz. T. 399, 424, 439. She did not record approximately eight of the calls. T. 439. She could not recall the dates of the unrecorded calls. T. 439–40. The tape recorded telephone conversations were not offered by the plaintiffs at the hearing, but the Court directed that the tapes be produced.[20] Twelve tapes consist-

---

**19.** Plaintiffs also submitted an affidavit of Mrs. Fisher. *See* Item No. 9.

**20.** The tapes were listed on plaintiffs' exhibit list, but were not produced prior to the hearing for inspection by the Court and the defendants, in

ing of fourteen telephone calls were played in Court during the hearing. These tapes consisted of telephone calls from Schwartz to Mrs. Fisher on September 13, 17, 24 and 26; October 3, 6, 11, 12 or 13, 18, 22 and 26 and November 8, 9 and 11, 1993.[21] Plaintiffs' Exhibits 15–26.

Plaintiffs' complaint characterizes the telephone calls from Schwartz to Mrs. Fisher as "harassing and foreboding" and as constituting "deliberate threats and intimidation." Complaint at ¶¶ 82, 283(a). The complaint also alleges that Schwartz told Mrs. Fisher that

> an inmate who reported the misconduct of any Correctional Officer would not stand a chance of a fair hearing, but rather instead such inmate would be put on a "Burn"—i.e. her life would become a "living hell" at the prison and she would be subjected to extreme "physical pain" and unfounded pretextual disciplinary action "tickets" from all correctional officers on a regular basis.

Complaint at ¶ 83. The complaint further alleges that Schwartz communicated to Mrs. Fisher that she should not inform prison officials that he was contacting her or retaliation would be inflicted upon Fisher. Complaint at ¶ 85. At the hearing, Mrs. Fisher repeated these allegations about, and characterizations of, the Schwartz telephone calls. T. 552, 569, 576, 620, 623.

After carefully reviewing the tape recorded conversations, the Court finds that the plaintiffs' complaint and Mrs. Fisher's testimony totally mischaracterize the nature and content of the telephone calls from Schwartz to Mrs. Fisher. No reasonable person, after having listened to these tapes, could possibly characterize them as harassing, foreboding, intimidating, or threatening in nature. Indeed, rather than being intimidating or threatening, Schwartz sounds like a lovesick

school boy, pining for his sweetheart and boasting to her mother about what a great guy he is. Although Schwartz' conduct in making the telephone calls to Mrs. Fisher was unquestionably inappropriate and in violation of the rules regarding correction officer contact with inmates and their families, T. 707, there is no indication that he made the calls for the purpose of threatening or intimidating the plaintiffs. Nor do these tapes in any way corroborate Fisher's claims that she was raped by Schwartz.

What the tapes do show is a devious, sordid and calculated "plan" by plaintiffs to set up Schwartz for the purpose of forcing a transfer of Fisher to a prison closer to home. Their scheme was to encourage Schwartz to call and to tape record his calls for use as leverage in gaining a transfer. In fact, the tapes themselves reveal, to some extent, plaintiffs' actual motivation. During one call, Mrs. Fisher, even though she knows she is being recorded, cannot help but complain about the distance she must travel in order to visit Fisher at Albion, and comment on how much easier it would be to make the much shorter trip to Bedford Hills to visit her. During another call, Mrs. Fisher states that she likes Bedford Hills better than Albion, because there are less "hassles" there. T. 608–11.[22]

On the tapes, Mrs. Fisher gives every indication of encouraging and welcoming Schwartz' calls. Throughout their conversations, Schwartz repeatedly asked Mrs. Fisher if his calls to her were bothering her and if she wanted him to stop. T. 553, 614, 618. She always said no and encouraged him to continue calling. T. 548, 602. She even told him at one point that she was "thrilled" that he called. T. 547–48. During the September 17th call, he asked her if it bothered her to talk about the parole board and she said, "no, I like hearing about this." T. 594. Later in

---

violation of the Court's Scheduling Order of August 27, 1996. Item No. 26. Instead, plaintiffs attempted to elicit testimony from Mrs. Fisher about the tapes without actually producing them. That is when the Court directed that the tapes be produced.

**21.** The Court was not provided with transcripts of the telephone calls, and has relied, instead, on its own notes regarding the content of the calls.

**22.** *See also* Complaint at ¶¶ 67–68 (complaining about visiting policies at Albion and the fact that Mrs. Fisher has to spend sixteen hours driving in order to effectuate only a six hour visit with her daughter).

the same conversation, he asked her if she was sure he was not being a nuisance and she assured him he was not, asking that he "please call." During the October 22nd call, Mrs. Fisher stated to Schwartz that she thought it was a "good idea" that he was calling. Mrs. Fisher admitted that she lied to Schwartz to get him to keep calling. T. 578–79. For example, she told Schwartz that Fisher had asked about him when, in fact, she had not.

Mrs. Fisher also encouraged Schwartz to write to Fisher. For instance, during the September 17th call, she told him that he should write Fisher a letter, because Fisher was not satisfied with her mother carrying messages. Even after Schwartz sent Fisher a card, Mrs. Fisher continued telling him that Fisher wanted a personal letter from him.

Plaintiffs' complaint completely distorts the October 22nd call, which contains the conversation regarding the term "the burn." Rather than a foreboding or intimidating conversation calculated to intimidate Mrs. Fisher, the tape reveals that the conversation about "the burn" was initiated and invited by Mrs. Fisher. Schwartz' description of "the burn" was in response to Mrs. Fisher's questioning and her direction of the conversation. His description of "the burn" was not of correction officers fabricating complaints, but of them choosing not to ignore actual infractions. The tape of the October 22nd call clearly shows that certain statements allegedly made by Schwartz and purportedly quoted in the complaint, for example "living hell," were actually made by Mrs. Fisher.[23] T. 566–67, 569. The tape also shows that Schwartz' reference to "pain," quoted in the complaint, was with regard to male inmates at Attica and was not directed at Fisher or the other female inmates at Albion.

Another example of the distortion contained in plaintiffs' complaint is the allegation that Schwartz referred to Fisher by demeaning names such as "gerbil." Complaint at ¶ 81. During the October 3rd call, Schwartz explained to Mrs. Fisher that "gerbil" was a term of affection that he used for Fisher because she had wanted a pet gerbil while she was at Albion. Clearly, Schwartz was not using the term "gerbil" in a demeaning way and Mrs. Fisher knew or should have known that at the time she filed her complaint.

Schwartz repeated several times during the telephone conversations that he never had any physical or sexual involvement with Fisher. During one conversation, he stated, "the most we've ever done is shake hands." During another conversation about media reports that Fisher was pregnant, Schwartz stated that if the media was blaming him for impregnating Fisher, it would be "an immaculate conception."[24] Although Schwartz did ask Mrs. Fisher on several occasions to tell Fisher that he loved her and to give her his love, there is no admission or indication on the tapes that he had a sexual relationship with Fisher.

In sum, it is clear from Mrs. Fisher's testimony, the instructions she received from her attorney, and the tenor of her conversations with Schwartz, that she was trying to set up Schwartz in order to further her "plan" to have Fisher transferred to a closer facility. Ironically, during one telephone call, Mrs. Fisher stated that "betrayal is a hurtful thing," to which Schwartz replied, "I won't betray her, I'm as loyal as a puppy."

Mrs. Fisher testified that the calls from Schwartz stopped after Fisher returned to Albion on or about November 15, 1993. T. 484. Mrs. Fisher testified that she and her attorney met with DOCS IG Brian Malone in

**23.** When confronted with the fact that Schwartz never used the term "living hell" on any of the tapes, Mrs. Fisher conveniently resorted to testifying that Schwartz used that term during one of the unrecorded telephone conversations. T. 567–69.

**24.** Mrs. Fisher testified that, at that point in time, October 1993, she knew that her daughter was not pregnant and was not concerned about the news stories containing rumors to the contrary.

T. 578, 605, 658. See also Item No. 9, Exhibits (Letter from Eric Naiburg to Superintendent Elaine Lord, dated October 25, 1993, stating, "I have absolutely no doubt that these stories are false and without foundation."). Mrs. Fisher never explained, however, why she was so certain that Fisher was not pregnant, even though Fisher supposedly had sex with Schwartz only a few months before.

January 1994, at her attorney's office. T. 484–88. At the meeting, Mrs. Fisher complained to Malone about Schwartz' relationship with her daughter and the telephone calls from Schwartz. T. 486, 502–04. She told Malone that Fisher and Schwartz had a "sexual relationship as well as a coercive relationship" and that Fisher no longer wanted Schwartz to be around her. T. 488. Mrs. Fisher told Malone that she wanted Fisher transferred out of Albion in order to "break up the relationship." T. 487–88.

Mrs. Fisher brought with her to the meeting with Malone the tape recordings of her telephone conversations with Schwartz. T. 503. Malone asked Mrs. Fisher to give him the originals of all the tapes, but Mrs. Fisher refused because Malone would not give her adequate assurances that Fisher would be safe from retaliation. T. 504–06, 544.

In November 1995, Mrs. Fisher called Albion complaining that Fisher had been kicked by defendant Shimley. T. 508. According to Mrs. Fisher, Fisher was subsequently interviewed by a person from the IG's office. T. 508. Mrs. Fisher testified that, in January 1996, she called IG Malone about the Shimley incident. Mrs. Fisher continued to maintain contact with Malone throughout the Spring of 1996. T. 513. Her last call to Malone was in April 1996. T. 514.

After observing Mrs. Fisher's demeanor while testifying, and carefully listening to and considering her testimony, the Court finds that she is not a credible witness. Her answers to questions, especially on cross-examination, were evasive and nonresponsive, sometimes to the point of refusing to answer the question at all. T. 577. On numerous occasions it appeared that Mrs. Fisher feigned being unable to understand simple, straightforward questions put to her by defense counsel. T. 556–57, 562–63, 577, 657–58. She had no such trouble understanding similar questions put to her by her own attorneys.

The tape recorded conversations between Mrs. Fisher and Schwartz show that Mrs. Fisher can be a devious, cunning and calculating person, who has the ability to lie convincingly, even under difficult and pressured circumstances. Her lack of credibility is also reflected by her complaint in this case. As discussed above, several statements of purported fact included in the complaint by Mrs. Fisher are not supported by the evidence adduced at the hearing. For example, her description of Schwartz' calls as "harassing and foreboding" is spurious. In fact, her mischaracterization of the content and nature of these telephone calls is so blatant that it clearly must have been intentional.

The Court finds that Mrs. Fisher's true motivation in this case is to have her daughter transferred out of Albion to a prison closer to their home because it will be more convenient and may perhaps hasten her daughter's parole. To accomplish this goal, she, her daughter and their attorney concocted a "plan" to set up Schwartz by asking him to call Mrs. Fisher and then recording his conversations with her.

### D. *Hearing Testimony of Robert Schwartz*

Plaintiffs called defendant Robert Schwartz, who testified that he has been a correction officer for DOCS for fifteen years and a sergeant since 1988. T. 706–07. Schwartz testified that he first met Fisher six or seven weeks after she arrived at Albion. T. 682. He stated that, when Fisher arrived at Albion, she was viewed as a "novelty" by some of the inmates and a "freak" by others. T. 683.

Schwartz testified that he never had sex with Fisher. T. 703. He stated that he thought of himself as "more of a father figure" to Fisher and that she came to him for advice. T. 706. He denied that he ever felt "in love" with Fisher or that he was infatuated with her. T. 693, 701. Schwartz testified that he was never alone with Fisher while she was at Albion, *i.e.*, where he could not be seen by others in the prison. T. 687, 1209–10.

Schwartz admitted that he made telephone calls to Mrs. Fisher during the time Fisher was being held in Bedford Hills in 1993. The day before Fisher was transferred to Bedford Hills, she asked him to telephone her mother. T. 1 208–09. Schwartz admitted that he improperly obtained Mrs. Fisher's

telephone number from the DOCS computer. T. 1 206–08. Schwartz viewed his telephone calls to Mrs. Fisher as "two adults having a conversation about a child." T. 692. When he was talking to Mrs. Fisher, he asked for a photograph of Fisher because Fisher told him that she wanted him to have one. T. 701–02. Schwartz testified that, during the time in question, he was drinking too much and was on prescription drugs. T. 702. He always called from a pay phone because he did not want his family or DOCS to find out that he was calling. T. 703. Schwartz also admitted that he wrote a letter to Fisher while she was at Bedford Hills and that such conduct was "dead wrong." T. 694–95, 707.

Schwartz testified that there came a time while Fisher was at Bedford Hills that he became aware of allegations that she was pregnant. T. 687. He read these allegations in the local newspaper. T. 687. Schwartz testified that a tabloid newspaper called Albion and mentioned that he was suspected of impregnating Fisher. T. 687–89. Schwartz then called Mrs. Fisher in order to try to assure her that he had not had a sexual relationship with Fisher. T. 689–90.

During his testimony, Schwartz defined the term "the burn" as follows:

Say you have an inmate doesn't make the bed and things, just don't go with the flow. Constantly disrespectful. You follow the rule book to the letter. All right . . . The inmates gave it that word. "You're on the burn." You know, when you get tickets for not—things like—normally, if the inmate goes with the flow, I would call you back and tell you, you forgot to make your bed. If you're consistently doing this stuff, I will issue a misbehavior report for—so the inmates say, "You're on the burn." . . . And you have an inmate constantly gives you problems, naturally your rec officer is going to be with [sic] there with you, or your rover. What you want to do is get this inmate to get his head

screwed on straight and start following the rules.

T. 696–97.

Schwartz testified that, in January 1994, he was questioned by IG Malone and another IG investigator about his relationship with Fisher. T. 678–79. Schwartz admitted to Malone that he had written a letter to Fisher and that he had called Mrs. Fisher. T. 707–08. As a result, he was transferred out of Albion. T. 707. Schwartz testified that he again spoke with IG Malone and several other investigators at the IG office in Albany, at the end of March, or in April 1994, about Fisher. T. 675. He was questioned under oath about his relationship with Fisher and his telephone conversations with her mother. T. 675–76.

After observing Schwartz' demeanor while testifying, and carefully listening to and considering his testimony, the Court finds that, for the most part, he is a credible witness. His testimony appeared to be consistent with statements he made on the tapes of his telephone calls to Mrs. Fisher, especially his description of the term "the burn." Schwartz admitted that his conduct was inappropriate, but consistently denied that he had any sexual relations with Fisher. The part of his testimony that the Court finds suspect is his denial that he was infatuated or in love with Fisher. The tapes tend to show that he was, at least, infatuated with Fisher.

### III. Defendants' Witnesses

#### A. Hearing Testimony of Lillian "Lucky" Nieves [25]

At the time of the hearing, Lillian "Lucky" Nieves was an inmate at Albion. T. 779. She was confined at Albion as a result of a felony drug conviction in the State of New York. T. 779, 81 8–1 9. Nieves testified that she has two felony convictions. T. 816.

Nieves testified that she first met Fisher in 1994 when they were housed in the same housing block at Albion. T. 780–81. At that time, Nieves was at Albion on a parole viola-

---

25. The Court was also provided with an affidavit and a written statement from Nieves. Item No.

17; Plaintiffs' Exhibit 29.

tion. T. 780. Nieves testified that, in 1994, she associated and spoke with Fisher, but they did not confide in each other. T. 781.

Nieves testified that she returned to Albion in 1995 after a new conviction. T. 781. At that time, she was housed in a cubicle directly across from Fisher and they became "very, very close." T. 781. She stated that she and Fisher "shared everything. Our clothing, our footwear, food, everything." T. 781. Nieves testified that Fisher was like her "little sister." T. 782, 846. Nieves testified that Fisher had a difficult time with other inmates and that she sometimes had to protect Fisher from being beaten up by the other inmates. T. 782–83, 846.

Nieves described Fisher as "very flirtatious" and "conniving." T. 790. She stated that Fisher "has her way of getting around people regardless of what sex they are, man or woman." T. 790. Nieves also described Fisher as "very theatrical . . . she dramatized everything." T. 803. At one point, Nieves testified that Fisher is "supposed to become a movie star, this is her debut right here, you're going to see this in the movies." T. 859. Nieves also implied that Fisher is promiscuous. She stated that Fisher "has sex with everything that moves." T. 845. She also stated, with regard to Fisher, that "[y]ou can't rape the willing." T. 828. Nieves testified that Fisher's inmate "lover" in Albion was a woman nicknamed "Sexy." [26] T. 905.

Nieves testified that she and Fisher knew everything about each other and that the dominant topic of their conversations was getting out of Albion. T. 783. Nieves testified that Fisher's "biggest worry" was going before the parole board at Albion. T. 783. She stated that Fisher felt that there was more of a chance of being denied parole at Albion than there would be at another prison. T. 783.

Nieves testified that Fisher came up with a "plan" for getting out of Albion in order to avoid the Albion parole board. T. 784–85, 859. Nieves testified that she discussed the "plan" with Fisher in January 1996. T. 785–

86. Fisher told her that, about a year earlier, she had sex with a correction officer, defendant Kuttner, and was able to get his semen on her underwear. T. 786. Fisher never told or indicated to Nieves that Kuttner raped her. T. 789, 868. Fisher told her that she smuggled the underwear out of Albion through a visitor and had it sent to a laboratory for DNA testing. T. 785–86. Fisher hoped that, when the underwear came back testing positive for semen, she would be given an administrative move. T. 785–87. However, Fisher became impatient because the "plan" was taking too long. T. 786–87. Fisher told Nieves that she needed to obtain additional semen from another correction officer so that she could claim that she was raped. T. 787. Fisher told Nieves that she needed another "vic" or victim. T. 787–88. In other words, she was going to have sex with another correction officer in order to obtain more semen. T. 788. Fisher identified defendant Thomas as a possible "victim." T. 789. Nieves testified that she did not think Fisher would target Sergeant Bailey because she was "intrigued" and "infatuated" with him. T. 789, 888.

Nieves testified that, on April 8, 1996, Fisher accompanied her to the library. T. 791. On the way, Fisher told Nieves that defendant Schmidt was on duty at the library and that he was going to be her "victim," the one from whom she would obtain the semen. T. 791. Nieves objected to Fisher's plan, because, in her view, Schmidt was "disgusting." T. 792. Fisher explained to her that she had to do it because she was losing her mind, and did not want to go before the parole board at Albion. T. 792.

Nieves testified that when they entered the library, Fisher went over and sat on Schmidt's desk and conversed with Schmidt the entire time they were in the library— about a half hour. T. 793–96. On their way back to the housing area from the library, Fisher told Nieves that she was going to return to the library that evening when everybody was gone in order to obtain semen from Schmidt. T. 796.

---

**26.** The Court notes that the name of Fisher's "lover," "Sexy," is the same as the tattoo she received while at Albion in 1994.

Nieves testified that she saw Fisher again at approximately 9:00 p.m. that evening and Fisher was "heated, angry." T. 798. Fisher told her that she had returned to the library and had sexual relations with Schmidt, but failed to obtain any semen from him. T. 798. Fisher further told her, however, that despite her failure to obtain semen, she would go ahead with her "plan" and claim that she was raped by Schmidt. T. 798. Nieves testified that she told Fisher that she did not want to become involved in her "plan," and when she refused to assist Fisher, Fisher falsely reported to correction officers that Nieves had stolen some of her personal belongings. T. 826–27. *See* Defendants' Exhibit 36 (Inmate Claim Form from Fisher, dated July 9, 1996). Nieves admitted that she felt animosity toward Fisher as a result of Fisher's false accusations against her. T. 897.

Nieves discussed several other instances of Fisher making false accusations against other inmates. T. 800–03. Nieves testified that Fisher admitted to her that she had planted contraband on other inmates. T. 902–03.

Nieves testified that she is a heroin addict and that, in the summer of 1996, she received a Tier III disciplinary ticket for testing positive for drugs. T. 820–21. Nieves testified that she received 90 days "in lock" as a result of that violation, but did not serve the entire time because she informed on another inmate (not Fisher). T. 823–25. Nieves testified that she was promised nothing in exchange for her testimony at the preliminary injunction hearing.[27] T. 807.

After observing Nieves' demeanor while testifying, and carefully listening to and considering her testimony, the Court finds that she is a credible witness. Despite her criminal history, her drug addiction and her admitted animosity toward Fisher, the Court

finds that Nieves answered questions truthfully and that her testimony was corroborated by other evidence, including the testimony of Fisher herself. Fisher admitted that Nieves was a close friend and that she had confided in her. She also admitted that Nieves accompanied her to the library on April 8, 1996, the date she was allegedly raped by Schmidt.

For the most part, Nieves' testimony was both internally consistent and consistent with other evidence adduced at the hearing. While there may have been present some motive for Nieves to lie, the Court does not believe that she did so. Nieves' description of Fisher as "flirtatious," "conniving," "theatrical," and promiscuous is consistent with her description of Fisher's "plan" to be transferred from Albion. Simply put, the Court finds Nieves to be a believable witness and credits her version of events.

**B.** *Hearing Testimony of Dr. John Patrick Fernandez* [28]

Dr. John Patrick Fernandez testified that he has been the Health Services Director at Albion for approximately 25 years. T. 907. As the Health Services Director, Dr. Fernandez delivers direct patient care and acts as supervisor and administrator for the remainder of the Health Services Department at Albion. T. 907.

Dr. Fernandez testified about the procedures used at Albion for inmates to receive medical care. T. 908–09. In particular, he testified about the health services provided to inmates confined in SHU or protective custody at Albion. T. 909. In SHU, a nurse makes rounds every day and checks each inmate and, once a week, a physician makes rounds as well. T. 909–10.

Dr. Fernandez described Fisher's current medical condition as good. T. 908. He testi-

---

**27.** At the time of her testimony, Nieves was waiting to be transferred to Taconic Correctional Facility ("Taconic"), another women's correctional facility in New York, because she had previously asked to attend a drug treatment program offered there. Her initial application was denied, but she was eventually accepted. T. 795. During her cross-examination, Nieves stated that she initially applied to the program because her inmate "lover" was transferred to Taconic. T.

811. At the time of the hearing, however, she testified that she had a new "lover" and no longer wanted to be transferred. T. 822. Nevertheless, Nieves was transferred to Taconic immediately following her testimony at the hearing. T. 973.

**28.** Defendants also provided an affidavit of Dr. Fernandez. Item No. 18.

fied that Fisher's medical records did not reflect any weight loss, and that the last time her weight was taken, it was exactly the same, 100 pounds, as when she entered the facility in 1992. T. 913–14. Dr. Fernandez testified that Fisher has refused to be weighed since August 1996. T. 924.

Dr. Fernandez testified that Fisher never reported any rape to the Medical Services Department. T. 913. Dr. Fernandez testified that one of his nurses did happen to see a program on television about Fisher's allegations of rape, and, in response, the Medical Services Department ordered Fisher to be seen by a gynecologist to determine whether anything should be done. T. 922. Dr. Fernandez testified that a routine examination of Fisher was done to determine whether she had contracted any sexually transmitted diseases, but no other recommendations were forthcoming from the gynecologist because of the remoteness of the event. T. 923. Dr. Fernandez testified that the medical department did not offer any rape counseling to Fisher. T. 923.

### C. *Hearing Testimony of Captain John M. Sherlock*

Captain John M. Sherlock testified that he has been employed by DOCS for over 21 years and is currently assigned to Albion. T. 932–33. Sherlock testified twice at the hearing on two consecutive days, October 22 and 23, 1996.

Sherlock testified that, after Fisher filed her lawsuit, prison authorities at Albion took several steps to ensure her safety. T. 942–43. First, Fisher was placed in IPC in SHU.[29] Second, the Superintendent of Albion issued a "no entry" order prohibiting the defendant correction officers in this case from entering SHU. Third, the Superintendent required a daily memorandum on Fisher's activities. T. 950–51. The memoranda detail Fisher's activities for each specific day in chronological order.

Sherlock explained that SHU is a group of cells designated by the facility Superintendent and approved by DOCS to house special categories of inmates, including inmates in disciplinary confinement, inmates who have requested PC, inmates who have been ordered into IPC, and administratively segregated inmates. T. 934. Sherlock further explained that IPC is ordered when prison security authorities feel that an inmate will be in danger in the general population, but the inmate herself refuses to go into PC. T. 935. Once an inmate is placed in IPC, the inmate's status is reviewed every 30 days by a three-member committee composed of an executive team member, a counselor and a security supervisor. T. 971. Before the inmate is released from IPC, the three member committee has to satisfy itself that placing the inmate into the general population will not place her in jeopardy above and beyond the norm associated with that environment. T. 972.

On August 26, 1996, Superintendent Andrews told Sherlock to "get up to speed on Inmate Fisher." T. 1025. He understood this to mean that he should read all the material that was available to him regarding Fisher so he could make a recommendation to Andrews regarding Fisher's security status. T. 1020–25. Andrews provided Sherlock with a copy of an affidavit of Lillian Nieves in this case and a copy of the *Times* article. T. 969, 1020–25. *See* Item No. 9, Exhibit 4. After reviewing these materials, Sherlock recommended that Fisher be placed in IPC, because he was concerned about her safety in the general population. T. 969, 1019, 1026, 1028, 1031. In particular, Sherlock was concerned about allegations by inmate Nieves in her affidavit to the effect that Fisher had "set up" other inmates. T. 1019. Sherlock explained that such accusations could have a "very negative effect on an inmate's position in general population," and create a potential danger for the inmate. T. 1019, 1031. Sherlock was also concerned about two statements attributable to Fisher that appeared in the *Times* article. The first statement was to the effect that Fisher suffers from a so-called "pin cushion" or target effect in the general population due to her

---

**29.** At the time Sherlock was testifying, Fisher was still in IPC. However, as discussed in more detail *infra*, Fisher was released into the general population following the preliminary injunction hearing.

notoriety. T. 1027, 1053. The second statement was a derogatory comment by Fisher about an inmate at Bedford Hills. T. 1027, 1053. Sherlock testified that these three points—Nieves' allegations that Fisher set up other inmates and the two statements in the New York Times article—together formed the basis of his IPC recommendation. T. 1027. Sherlock's IPC recommendation was reviewed and upheld by the IPC hearing officer. T. 968.

Sherlock testified that, whether the statements in Nieves' affidavit and the *Times* article were true was irrelevant; what was relevant was the inmate population's perception of Fisher. T. 1037–38. If the inmate population felt that the statements by, or about, Fisher were true, such statements could cause retaliation against Fisher and endanger her safety, regardless of whether the statements were in fact true.[30] T. 1038.

Sherlock testified that, while Fisher was in disciplinary confinement in SHU, prior to being placed in IPC, Superintendent Andrews ordered that Fisher should recreate alone. T. 1061. *See* Plaintiffs' Exhibit 3 (memorandum from Superintendent Andrews to Fisher, dated August 5, 1996, stating, "in response to your published allegations of physical retaliation, it is deemed prudent that your physical contacts be limited to accommodate your perception of your increased need to insure your safety."). While in IPC, however, Fisher was allowed three hours of recreation a day and was allowed to comingle and recreate with other IPC and PC inmates. T. 969. Sherlock testified that he had seen Fisher recreate with other inmates while she was in IPC. T. 970. At one point, only Fisher and another inmate named Figueroa were in either IPC or PC status, but Fisher refused to recreate with Figueroa. T. 970. Fisher wrote a letter to the Deputy Superintendent asking to recreate separately from Figueroa and that request was granted. T. 970. Sherlock testified that while Fisher was in SHU, her telephone conversations were tape recorded in order to determine

whether she felt that she was in danger from other inmates. T. 1089–91. Sherlock indicated that it was not unusual for prison officials to tape record inmate telephone calls for investigative purposes. T. 1089–91.

Sherlock testified that he continued to research the issue of Fisher's safety over the following 30-day review period and that the Deputy Superintendent of Security at Albion, Donald Wolfe, interviewed several people regarding the issue. T. 1031. After the initial review period, Sherlock determined that there was nothing precluding Fisher from returning to the general population upon the next review. T. 973, 1031–32. He explained that inmate Nieves had been transferred to Taconic immediately following her testimony at the hearing so that: (1) Fisher could reenter the general population; and (2) Nieves could attend a drug rehabilitation program at Taconic. T. 973. Sherlock explained that Fisher could not be released from IPC to the general population prior to Nieves' transfer because they were placed on a separation list as a result of a formal request, approved by DOCS, to separate the two inmates. T. 973–74. Once Nieves was transferred, Fisher could reenter the general population. T. 974. Sherlock testified that all transfer requests go through the guidance and counseling part of the facility. Thus, he was unaware of who made the decision or when the decision was made to transfer Nieves. T. 977–78.

Sherlock testified that he had no information that Fisher was in any danger of retaliation from correction officers as a result of her allegations against the defendants in this action. T. 111 8. He also testified that he had no information that Fisher was presently at risk from any staff personnel or other inmates. T. 1099.

Sherlock testified that he knew of no evidence of any sexual abuse of Fisher by correction officers. T. 1086. Sherlock testified that if an inmate's complaint about a correction officer or another inmate is corroborated

---

**30.** As stated earlier, Fisher admitted during her testimony, and Nieves also testified, that Fisher had a history of being unable to get along with other inmates and of other inmates attacking her. *See also* Complaint at ¶¶ 59, 95; Plaintiffs' Exhibit 8 (letter dated November 8, 1993, from Eric Naiburg to Elaine Lord, Superintendent Bedford Hills, complaining about assaults and thefts against Fisher by other inmates).

by an initial investigation, then the facility will do a further investigation. Sherlock further stated, however, that if the accusation is a rape, corroboration is unlikely unless a report of the rape is made close in time to the event. T. 1093. Sherlock explained that, before ordering an inmate transferred based on allegations against a correction officer, those allegations must be substantiated through investigation. Otherwise, inmates would be able to manipulate the system simply by making unsubstantiated, uncorroborated claims of abuse. T. 1085–86.

During the first day of his testimony, Sherlock stated that Fisher was going to be released from IPC into the general population, and that she was going to be treated just like any other inmate at Albion. T. 991. He testified that there were going to be no special arrangements made to prevent her from having contact with the defendant correction officers in this case and that she could potentially be required to commingle with them. T. 991–92. When Sherlock was recalled to testify the next day, however, he stated that, after consultation with Superintendent Andrews and Deputy Superintendent of Security Wolfe following his testimony the previous day, a special policy would be implemented to limit Fisher's contacts with the defendant correction officers. T. 1288. Sherlock testified that the following measures would be taken upon Fisher's release from IPC: (1) a supervisor of a higher rank would be present if it were necessary for a defendant to come in contact with Fisher; (2) Fisher would be housed in one of the housing blocks where none of the defendants work; and (3) Fisher would be assigned to a job on the grounds crew, which promotes high visibility to both staff and inmates. T. 1289–90.

### D. *Hearing Testimony of Michael Urban*

Michael Urban testified that he is employed by DOCS as an assistant IG and is in charge of the central monitoring unit. In that capacity, he and his staff monitor all high profile inmates within DOCS. T. 1127.

Urban testified that he also acts as a liaison for outside law enforcement agencies and does intelligence work within DOCS. T. 1127.

Urban testified that an inmate is classified as a central monitoring case ("CMC") based on a number of criteria, which may include high publicity, high notoriety, the nature of the instant offense, or any other circumstance that would require that the inmate be given special attention or monitoring by DOCS. T. 1127–28. He further testified that CMC's are broken down into two categories, A and B. T. 1128. Fisher was designated as a CMC A. T. 1128. Urban testified that, because Fisher is a CMC A, he must give approval for any transfer or movement of Fisher external to the facility. T. 1128–29. For example, if Fisher is to be transferred to another correctional facility, or from Albion to the courthouse for a hearing, Urban must be notified and must approve the move. T. 1129.

Urban testified that Fisher's current security status is medium security. T. 1130. There are three medium security female correctional facilities in the DOCS system, Albion, Taconic and Bayview Correctional Facility ("Bayview").[31] T. 1130.

Urban testified that there are a number of considerations taken into account when deciding whether to transfer an inmate, including the programs available at the different facilities, the psychological history of the inmate and the location of the inmate's home. T. 1168–69. Urban testified that DOCS tries to house inmates as close as possible to their homes, but that it is not always possible because a majority of the inmates come from the New York City area. T. 1169.

Urban testified that another consideration he must take into account when deciding whether to approve a transfer of a prisoner is whether that prisoner has any "enemies" in the other facility. T. 1130. Urban testified that "separatee data" or a so-called "enemy list" is data compiled by DOCS regarding any "enemies" an inmate might have that would prohibit those inmates from being

**31.** Taconic is located on the same grounds as Bedford Hills, in Westchester County. Bayview is located in New York City.

housed together in the same facility. T. 1129–30. Urban defined the term "enemy" as follows:

> Well an enemy is, could be somebody where they have had a fight with each other or an enemy could be somebody where one inmate has testified against another person, so there may be some retaliation if they were seen. Those kinds of thing[s]. There would be situations where the two people were in the same facility, there could be hostilities and possibly more serious ramifications based on their prior activities together.

T. 1139. Urban testified that an inmate may request that another inmate be placed on her enemy list. T. 1147. Urban stated that the inmate fills out a form telling her counselor why she wants the enemy placed on the list and must provide valid reasons. T. 1147. The counselor investigates whether the reasons are valid and submits the request for separation to Urban's office. T. 1147. Urban's office may ask more specific questions regarding the validity of the request. T. 1148. Urban explained that an inmate's claim that another inmate is an enemy must be verified before the other inmate is put on an enemy list because,

> [w]e have inmates who like to move themselves around the state, and if an inmate who is say in Albion, doesn't like to be in Albion, and wanted to direct themselves to a specific facility say like Bayview, then they would create enemy situations and try to create enemy situations at Bedford, Taconic and Albion, which would steer them to Bayview.

T. 1159–60. Urban testified that DOCS, itself, may place an inmate on another inmate's enemy list if there is some objective reason for doing so, such as the inmates having had a fight while in the facility. T. 1147.

Urban testified that, on August 26, 1996, a request was made to place Lillian Nieves on Fisher's enemy list, and that Nieves was added to the list on September 19, 1996.[32] T. 1161–62. Urban testified that, around that same time, a counselor at Albion recommended that Fisher be transferred. T. 1181. When Urban saw the transfer recommendation, he reviewed Fisher's enemy list and determined that she could not be moved to any of the other medium security facilities because she had enemies in each of those facilities. T. 1130, 1182. Further, she could not be transferred to Bedford Hills, a maximum security facility, because she had enemies there also. T. 1130–31.

Urban testified that he was aware that Fisher had made allegations that she was sexually assaulted by some of the staff at Albion, but that those allegations, in and of themselves, were not sufficient to cause her to be transferred. T. 1131. Urban explained that:

> First of all we don't just move inmates because based on allegations. If we did that, we'd have inmates moving all over the system—just they would make up allegations. Normally the cases that have allegations have to be investigated to determine whether there is any validity to them. If we see validity and there is a problem then the transfer may be possible then.

T. 1131.

Urban testified that the IG's office is currently conducting an investigation of Fisher's allegations of rape and sexual abuse by correction officers. T. 1132. He further testified, however, that a prior investigation regarding defendant Schwartz was closed because Mrs. Fisher was uncooperative and refused to provide IG Malone with evidence that she allegedly had in her possession. T. 1132–34, 1192–93.

### E. Hearing Testimony of Dr. J. Richard Ciccone [33]

Dr. J. Richard Ciccone, a physician and professor of psychiatry at the University of Rochester School of Medicine, examined Fisher at the request of the defendants. Dr.

---

32. For security reasons, the Court did not require Urban to testify as to who made the request.

33. Defendants also provided the Court with a copy of Dr. Ciccone's report.

Ciccone has a very impressive educational and professional background. T. 1214–18.

Dr. Ciccone testified that the purpose of his examination of Fisher was to determine if she suffered from any major psychiatric disorders and if so, to determine whether such disorders were caused by her confinement in SHU at Albion. T. 1219–20. His examination consisted of a four-hour interview of Fisher on October 1, 1996, and a review of numerous materials provided to him by the defendant prison officials, including Fisher's medical and mental health records from both before and during her incarceration. T. 1220–36. Dr. Ciccone also reviewed the notes and report of Dr. Ewing, and transcripts of earlier portions of the hearing, including Dr. Ewing's testimony. T. 1222.

Dr. Ciccone testified that after conducting his examination of Fisher, it is his opinion, within a reasonable degree of medical certainty, that during the summer of 1996, Fisher had an adjustment disorder with depressed mood and anxiety resulting from her isolation in disciplinary confinement in SHU at Albion, *i.e.*, isolation was the stressor for the adjustment disorder. T. 1222–23. At the time he interviewed Fisher, her disorder was in remission. T. 1222, 1236. He further noted that Fisher had some character or personality style issues that did not, in his opinion, rise to a personality diagnosis, but indicated that there were some histrionic and antisocial features in her history. T. 1222.

Dr. Ciccone testified that Fisher told him that her father was physically and sexually abusive toward her and that the parental relationship was troubled. T. 1223. Fisher told him that she had tried running away from home on several occasions when she was younger. T. 1224. Dr. Ciccone testified that Fisher's medical records indicate that she was evaluated in March 1991, and was found to be a difficult and defiant individual. T. 1225. They further indicate that she had "adjustment disorder with mixed disturbance of emotions and conduct, . . . depression, anxiety, and run away behavior and defiant." T. 1225. On or about September 25, 1991, Fisher attempted to commit suicide by ingesting pills. When Fisher was evaluated for purposes of her state court proceedings, she was found to be suffering from a variety of conditions, including an adjustment disorder with mixed disturbance of emotions and conduct, a post-traumatic stress disorder with delayed onset, and a borderline personality disorder. T. 1226.

Fisher told Dr. Ciccone that when she first arrived at Albion she ate well and gained weight, reaching a maximum weight of approximately 115 pounds. T. 1227. Dr. Ciccone testified, however, that he found no documentation for that fact. T. 1227. Fisher also told him that she began smoking in 1994 and since the end of 1994, had steadily been losing weight. At the time of the interview, she weighed approximately 105 pounds, which is approximately what she weighed when she first entered the facility. T. 1227.

Fisher told Dr. Ciccone that while she was in the SHU, she was tearful and had difficulty sleeping. T. 1 227. She explained that her difficulty sleeping was due, in part, to the uncomfortable bed on which she had to sleep. T. 1227. Fisher also reported that while in SHU, she had difficulty concentrating and reading because her mind kept wandering. T. 1227. Fisher complained that while in disciplinary confinement, she lacked human interaction. T. 1227–28. She further reported, however, that since being transferred from disciplinary confinement to IPC, she "felt more human." T. 1228.

Dr. Ciccone testified that, during his interview of Fisher, she told him several times that being closer to home was not the issue. T. 1228–29. These statements were unsolicited by Dr. Ciccone. T. 1228–29. Dr. Ciccone interpreted these statements to mean that Fisher was assuring him that her difficulties were with disciplinary confinement and did not stem from wanting to be closer to home. T. 1229.

Dr. Ciccone testified that at the time he interviewed Fisher, she no longer appeared to be suffering from an adjustment disorder. T. 1229. He testified that Fisher's adjustment disorder appeared to have gone into remission due to: (1) the change in environment from disciplinary confinement to IPC; (2) the additional human contact that she had as a result of these court proceedings; (3)

the return of her personal property; (4) the move to another cell that was a little larger and had a separate bathroom area; and (5) the ability to talk with other inmates across the hall in SHU. T. 1229, 1237, 1271.

Dr. Ciccone testified that he performed a mental status examination of Fisher and saw no signs or symptoms of any mental illness. T. 1233–34, 1236. Nor did he detect any suicidal ideation. T. 1282. Dr. Ciccone testified that he found Fisher's mental state to be consistent with other inmates he had examined under similar circumstances. T. 1241. While Fisher was displeased with her situation, she did not exhibit any type of psychiatric disorder. T. 1241. Dr. Ciccone testified that he believed Fisher's attitude and depression would improve rapidly once she was let back into the general population and was able to interact with other people. T. 1232, 1246. Fisher indicated to Dr. Ciccone that she wanted to return to the general population. T. 1281. Dr. Ciccone testified that, according to Fisher's medical records, Fisher was offered the opportunity for psychotherapy while at Albion, but declined. T. 1269.

Dr. Ciccone testified that, during his interview of Fisher, she never brought up her allegations that she was raped by correction officers. T. 1262. He testified that he did not detect that Fisher had any sense of fearfulness toward the correction officer defendants, nor did she tell him that she was afraid. T. 1242–43. Dr. Ciccone testified that whether Fisher was in Albion or some other correctional facility would not affect her mental state. T. 1243.

Dr. Ciccone testified that he disagreed with some of Dr. Ewing's conclusions regarding the severity of Fisher's depression and the immediacy of the danger. T. 1241. Dr. Ciccone did not find as severe an illness or immediate danger. He did state, however, that if Fisher were to remain in isolation over a longer period of time that she could begin to become more anxious and depressed, and develop an adjustment disorder that could emerge eventually into a major depression. T. 1241–42.

Dr. Ciccone testified that if a woman were raped and could not avoid the man that raped her, such a circumstance would be a "terrible stressor." T. 1265–66. Dr. Ciccone also testified that forcing a woman to return to the scene of a rape could also be a stressor. T. 1268. Dr. Ciccone testified that these kinds of stressors could cause psychiatric disorders or recurrence of psychiatric disorders in remission. T. 1268.

The Court finds that Dr. Ciccone was a credible and persuasive witness. Unlike Dr. Ewing, Dr. Ciccone reviewed Fisher's prior mental health records as part of his examination. Thus, he had a more thorough understanding of Fisher's psychiatric history and his opinion was, therefore, more informed than that of Dr. Ewing.

## IV. Affidavits

### A. Affirmation of Donald Wolfe Filed August 22, 1996

On August 22, 1996, defendants filed an affirmation of Donald Wolfe, Deputy Superintendent for Security at Albion. Item No. 16. In his affirmation, Wolfe stated that, at that time, Fisher was serving a penalty of 60–days' disciplinary confinement in the SHU as a result of an incident that took place on May 2, 1996. Wolfe denied that Fisher's confinement in SHU differed in any way from any of the other inmates confined in SHU at Albion, and that her confinement was consistent with DOCS regulations that apply not only in Albion, but in every facility maintained by DOCS. Wolfe stated that as part of her disciplinary penalty, Fisher lost 60–days' telephone privileges. She did not, however, lose any mail privileges or privileges with respect to legal calls. In addition, Fisher was still able to receive both legal and non-legal visitors. Wolfe further stated that he had taken steps to ensure that none of the correction officers named as defendants in this action had any contact with Fisher. Wolfe stated that, as a further attempt to ensure Fisher's safety, Albion required that the security staff submit daily reports concerning Fisher's condition and activities.

### B. Affidavit of Chester H. Clark Filed August 22, 1996

On August 22, 1996, defendants filed an affidavit of Chester H. Clark, Assistant Com-

missioner of Population Management for DOCS. Item No. 15. In his affidavit, Clark stated that, although Article 5–A of the New York Correction Law, titled "Interstate Corrections Compact," gives the State the authority to transfer inmates committed to its custody to another state's correctional system, DOCS has never effectuated a single interstate transfer of a New York inmate to another state's correctional system, despite hundreds of inmates having requested to be transferred pursuant to the statute. Clark stated that an interstate transfer would only be approved under extraordinary circumstances. This is due to the cost and safety concerns associated with such a transfer. Similarly, Clark stated that transfers of New York inmates into the custody of FBP have been rare. At present, there are only three New York inmates who have been transferred to FBP following a request initiated by DOCS. Clark stated that there are two reasons for DOCS to transfer an inmate to FBP: (1) the inmate poses a potential danger due to his or her relationship with a highly organized criminal element or gang within the community or within the prison system; or (2) when there is a danger to the inmate posed by other inmates because the inmate cooperated with a major criminal investigation. Clark pointed out that FBP must agree to accept the DOCS inmate, and that, if FBP does agree, it has sole discretion to decide what specific institution it will use to house the inmate.

## C. Supplemental Affidavit of Donald Wolfe Filed September 13, 1996

On September 13, 1996, defendants filed a supplemental affidavit of Donald Wolfe, Deputy Superintendent of Security at Albion. Item No. 45. In his affidavit, Wolfe stated that: (1) defendant Kuttner no longer works at Albion and has left DOCS employment; (2) defendant Hemley no longer works at Albion and was assigned to another DOCS facility on June 6, 1994; (3) defendant Schwartz no longer works at Albion and was assigned to another DOCS facility on June 9, 1994; (4) each of the remaining individual defendant correction officers in this action was restricted from working in areas of the prison where he would have contact with Fisher; and (5) each of the individual defendant correction officers was restricted from entering SHU, where Fisher was being housed.

## D. Affidavits of Defendants DiSalvo, Galbreath and Hemley

On September 13, 1996, defendant Gary DiSalvo filed an affidavit on his own behalf. Item No. 44. He stated that: (1) he never had any sexual contact with Fisher at any time; (2) he never made sexual advances toward Fisher at any time; (3) he never had sexual intercourse with Fisher at any time; and (4) Fisher's allegations that he had forcible sexual intercourse with her and that he threatened her are false.

On September 16, 1996, defendant Michael Galbreath filed an affidavit on his own behalf. Item No. 51. He stated that: (1) contrary to Fisher's allegations, he never assaulted, sexually harassed or physically abused her; (2) he never made any sexual advances toward Fisher; (3) he never filed any false or unfounded disciplinary reports against Fisher; (4) he never witnessed or had any knowledge of any sexual advances or inappropriate behavior by defendant Stiles toward Fisher; and (5) all the allegations by plaintiffs against him are untrue.

On October 23, 1996, defendant Frederick Hemley filed an affidavit on his own behalf. Item No. 94. He stated that: (1) he is now a correction officer at Cayuga Correction Facility; (2) contrary to Fisher's allegations, he never raped, sodomized, sexually abused, harassed or used any force upon Fisher; and (3) Fisher's allegations about him are untrue.

## E. Affidavit of Donald Wolfe Filed November 8, 1996

On November 8, 1996, following the preliminary injunction hearing, defendants submitted an affidavit of Donald Wolfe, Deputy Superintendent for Security at Albion. Item No. 98. Wolfe stated that, on October 24, 1996, the IPC Committee conducted a review of Fisher's confinement status and, as a result of the review, Fisher was released to the general population that day. Wolfe further stated that, at the time of Fisher's release

into the general population, the measures outlined by Captain John Sherlock in his testimony on October 23, 1996, were put into place, *i.e.:* (1) Fisher was assigned to a dormitory where none of the defendant correction officers are assigned to work; (2) a supervisor of higher rank must be present if it is necessary for a defendant correction officer to come in contact with Fisher; and (3) Fisher was given a work assignment to the facility grounds crew.

Although Wolfe's affidavit was filed after the conclusion of the evidentiary portion of the preliminary injunction hearing, the Court has accepted and considered it, because: (1) it deals with relevant facts that occurred only after the hearing was completed; and (2) plaintiffs have submitted nothing to dispute any of the statements therein.

### V. *Summary of Findings Regarding Other Exhibits*

Prior to the hearing, the parties provided the Court with several volumes of exhibits consisting mostly of various records and documents pertaining to Fisher, including medical records, psychiatric records, prison disciplinary records, prison counseling records, prison administrative records, and correspondence records. None of the parties made any objections to the exhibits when they were submitted. Although most of these exhibits were not formally introduced into evidence at the hearing, the Court has read and considered them, and now makes several general findings of fact based on them.

The exhibits show that Fisher has been seeking a transfer from Albion to a facility closer to her home, continuously, since the time she first entered Albion, and before any of the alleged sexual misconduct by correction officers contained in the complaint. *See, e.g.,* Plaintiffs' Exhibit 5 (letter from Eric Naiburg to James Flateau, dated February 11, 1993, "[I]t would appear that it would be in the best interest of the Department of Corrections, and Fisher, that she be transferred to a different institution. I recognize that I have absolutely no input regarding the choice of institutions, although I would urge one of the institutions in Westchester County. I recognize that Bedford Hills is a maxi-

mum security facility, however, her physical well-being would be most protected in such an institution"); Defendants' Exhibit 36 (memorandum from Sergeant Van Kamp to Captain Kearney, dated March 4, 1994, stating that Fisher requested a transfer to another facility) (letter from Fisher to Sergeant Bailey, written on or about November 24, 1995, stating that defendant Shimley "tried to convince me to help him by telling me that I would get transferred—something that I make no secret that I want"); Defendants' Exhibit 40A (DOCS Inmate Review Packet for period September 2, 1995 to December 1, 1995, "inmate interested and meets criteria to be transferred closer to home").

The exhibits also show that Fisher has had significant disciplinary problems while at Albion. *See* Defendants' Exhibit 6. She has been disciplined on numerous occasions for disobeying direct orders from staff, smuggling, and failing to obey the rules of the institution. Her disciplinary problems began almost immediately upon arriving at the institution. Numerous counseling reports confirm that Fisher has had a difficult time adjusting to institutional life. *See, e.g.,* Defendants' Exhibit 40A (DOCS Inmate Review Packet for period December 14, 1992 to March 15, 1993, "poor institutional adjustment") (DOCS Inmate Review Packet for period June 2, 1995 to September 1, 1995, "very poor institutional adjustment").

The exhibits further show that Fisher has had numerous conflicts and problems with other inmates at Albion. *See, e.g.,* Defendants' Exhibit 36 (note from Fisher to Sergeant Van Camp, dated March 4, 1994, complaining about threats of physical violence by inmate Mirayes) (Report of Inmate Injury, dated September 23, 1994, stating that Fisher was punched several times by inmate Powell while she was sleeping) (note from Fisher to Superintendent Andrews, dated December 16, 1994, complaining about inmate David stealing her property) (note from Fisher to "Captain," undated, complaining about threats from inmate Vassel) (note from Fisher to Superintendent Andrews, dated August 16, 1995, complaining that inmate Copeland was threatening her and spreading rumors that she was sexually active with

correction officers); Defendants' Exhibit 40C (memorandum from Helene Rattiner to Deputy Superintendent Smith, dated October 28, 1993, regarding Fisher's report that inmate Smyth was trying to extort money from her) (Protection Waiver Form by Fisher, dated August 11, 1993, stating that she was assaulted by inmate Singleton). Her difficulty with other inmates also began almost immediately upon her arrival. See Defendants' Exhibit 40E (note from Fisher to Deputy Superintendent Smith, dated December 11, 1992, requesting to be transferred within Albion because other inmates were harassing her).

Moreover, the exhibits show that Fisher has been neither hesitant nor fearful about complaining to prison authorities about the conduct of correction officers. In fact, she started complaining about correction officers from almost the moment she arrived at Albion. See, e.g., Defendants' Exhibit 36 (letter from Fisher to Deputy Superintendent Stevens, written on or about January 14, 1993, complaining about a ticket from Correction Officer Stirk and alleging that Stirk made false statements) (letter from Fisher to Superintendent Andrews, dated July 11, 1995, complaining about conduct of Sergeant Adamczyk) (note from Fisher to Superintendent Andrews, date stamped February 9, 1994, complaining about search of her cell by defendant Stiles, and signed "one outraged inmate"); Defendants' Exhibit 37 (grievances from Fisher, dated February 9 and 17, 1994, complaining about being harassed by defendants Stiles and Galbreath); Defendants' Exhibit 40B (letter from Fisher to Superintendent Andrews, date stamped February 24, 1993, complaining about the conduct of defendant DiSalvo).

In sum, these exhibits, when taken together, show that from the moment Fisher arrived at Albion: (1) she has had a difficult time adjusting to institutional life; (2) she has had difficulty getting along with other inmates; (3) she has had difficulty taking orders from correction officers; (4) she has not been bashful or timid about complaining to prison authorities about perceived misconduct by correction officers; and (5) she has been continuously requesting transfers to another facility closer to her home.

## CONCLUSIONS OF LAW

### I. Preliminary Injunction Standard

■ A party seeking a preliminary injunction ordinarily must show that it will suffer irreparable harm in the absence of an injunction, and demonstrate either: (1) a likelihood of success on the merits; or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. See Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996). In some circumstances, however, an even higher standard applies. Where the injunction sought will alter, rather than maintain, the status quo by commanding some positive act, it is properly characterized as a mandatory rather than a prohibitory injunction, and the moving party must show a "clear" or "substantial" likelihood of success on the merits. Jolly, 76 F.3d at 473; Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 33–34 (2d Cir.1995); Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir.1985). A district court should show "greater reluctance to issue a mandatory injunction than a prohibitory injunction." Abdul Wali, 754 F.2d at 1025.

■ The burden of proving that a preliminary injunction should be issued rests entirely and always with the movant. The party seeking the injunction bears a heavy burden. Liddy v. Cisneros, 823 F.Supp. 164, 173 (S.D.N.Y.1993). A preliminary injunction is an extraordinary and drastic remedy, and must be denied "absent a clear showing that the movant has met its burden of proof." Karmikel Corp. v. May Dep't Stores Co., 658 F.Supp. 1361, 1367 (S.D.N.Y.1987).

■ In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons. Farmer v. Brennan, 511 U.S. 825, 846–47, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994) (in the prison context, "a district court should approach issuance of injunctive orders with the usual caution"); Goff v. Harper, 60 F.3d 518, 520 (8th Cir.1995) ("[I]n the prison context, a request for injunctive relief must

always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'"); *Taylor v. Freeman,* 34 F.3d 266, 268–69 (4th Cir.1994); *Streeter v. Hopper,* 618 F.2d 1178, 1181 (5th Cir.1980) ("Courts should proceed cautiously in cases of this kind, to prevent courtroom magnification of the general dangers inherent in prison life from precipitating unnecessary judicial interference in the operation of state prisons."). This cautious approach to judicial intervention in the prison context is based on concerns of federal judicial competency and comity. *Taylor,* 34 F.3d at 268. Injunctive relief should therefore be issued in the prison context only in extraordinary circumstances. *Id.*

■ Here, plaintiffs are asking the Court to issue a preliminary injunction ordering DOCS to transfer Fisher to a federal prison or, in the alternative, to another prison in New York or elsewhere. The requested relief is clearly mandatory rather than prohibitory in nature as it would alter the *status quo* by requiring the defendant prison officials to surrender custody of Fisher, a New York inmate, to another jurisdiction, or to transfer Fisher to another prison in the DOCS system. Thus, plaintiffs must establish irreparable harm and a clear or substantial likelihood of success on the merits before such relief may be granted.

## II. *Irreparable Harm*

■ The Second Circuit has held that to establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent. *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989). "[A] finding of irreparable harm is an absolute prerequisite to the issuance of an injunction." *Fireman's Fund Ins., Co. v. Leslie & Elliott Co.,* 867 F.2d 150, 151 (2d Cir.1989). A preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent *future* irreparable harm. *See Buckingham Corp. v. Karp,* 762 F.2d 257, 262 (2d Cir.1985) ("The linchpin of such interim relief is that threatened irreparable harm will be prevented by the injunction.").

In this case, although not clearly expressed in their papers, plaintiffs appear to be asserting that Fisher will suffer irreparable harm in four ways if she is required to remain at Albion: (1) she will be subject to the risk of further rapes and sexual abuse; (2) she will be subject to retaliation by the defendants and other prison officials; (3) she will suffer psychological harm as a result of being forced to remain at the site of the alleged rapes and to come in contact with the defendant correction officers who allegedly raped her; and (4) she will be subject to further violations of her First Amendment rights. The Court finds that plaintiffs have failed to show that Fisher will suffer irreparable harm if she remains at Albion.

### A. *Risk of Future Rapes and Sexual Abuse*

■ Fisher testified that she has been the victim of numerous rapes and sexual abuse by the defendant correction officers, and argues that she should be transferred in order to prevent any future attacks. The Court finds this argument unpersuasive for several reasons.

First, Fisher's claims of rape and sexual abuse are undermined by severe credibility problems. As stated above, the Court finds that Fisher is not a credible witness. Further, her testimony was both uncorroborated and inconsistent with the testimony of other witnesses and evidence in the record.

Second, even if it is assumed *arguendo* that Fisher's allegations of past rapes and sexual abuse are true, prison officials at Albion have now taken steps to protect Fisher from any such attacks in the future. The defendant prison officials have issued orders prohibiting unsupervised contact by any of the defendant correction officers with Fisher. Three of the five defendant correction officers who allegedly raped her, Schwartz, Hemley and Kuttner, no longer work at Albion. In addition, Fisher has been returned to the general population, placed in a housing unit where none of the defendant correction officers work, and assigned to a prison job that promotes high visibility among prison

officials and other inmates.[34] She also has access to supervisors at any time. These measures, taken by Albion in order to protect Fisher, not only protect her from any risk of harm from the defendant correction officers, but also deal with her complaints of isolation while she was in SHU.[35]

Third, the State of New York passed into law, effective August 1, 1996, a statute that classifies any sexual relations between a prison employee and an inmate as statutory rape. N.Y. Penal L. § 130.05(3)(e). This new statute should act as a further deterrent to the type of conduct alleged by Fisher in this case.

In sum, the Court finds there is little risk that Fisher will be subject to rape or sexual abuse if she remains at Albion.

### B. *Retaliation*

█ Plaintiffs claim that Fisher has been retaliated against as a result of her allegations against the defendants and that she will continue to be retaliated against in the future. Fisher claims that defendants have retaliated against her in three ways: (1) on June 27, 1996, she was unjustifiably placed in disciplinary confinement in SHU; (2) while in SHU, she was not allowed to recreate with other inmates and her telephone conversations were tape recorded; and (3) on August 27, 1996, after her disciplinary confinement term had expired, she was placed in IPC in SHU. The evidence shows, however, that these actions were not taken against Fisher for purposes of retaliation, but were taken for legitimate penological reasons.

Fisher was placed in disciplinary confinement in SHU on June 26, 1996, as a result of two love letters that she wrote to a correction officer in violation of the rules of inmate behavior. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2, rule 101.10 ("Inmates shall not engage in, encourage, solicit or attempt to force others to engage in sexual acts."). There is no evidence that she was disciplined in retaliation for her allegations in this case. In fact, the complaint in this case had not even been filed at that point. Nor did her confinement in SHU limit her ability to speak with individuals outside of Albion. She retained mail privileges, legal telephone call privileges and visitation privileges while in SHU.

█ Fisher's claim that defendants retaliated against her by making her recreate alone is frivolous. Although inmates have a constitutional right to exercise, there is no constitutional or statutory right to exercise or associate with other inmates. Superintendent Andrews decided that, based on Fisher's allegations of physical retaliation by other inmates, it was prudent to limit her physical contacts with others. This Court is not here to second guess such a penological determination or to become involved in the minutiae of day-to-day prison life. There is no evidence that Superintendent Andrews had a retaliatory purpose when she ordered Fisher to recreate alone. Further, the evidence shows that Fisher did, in fact, have an opportunity to recreate with other inmates while she was in SHU. Captain Sherlock testified credibly that he saw her recreate with others while she was in SHU. In addition, Fisher admits that she was given an opportunity to recreate with inmate Figueroa, but expressly declined to do so.

---

**34.** The Court assumes that all these measures will remain in place throughout the pendency of this action. If this is not the case or circumstances change, the Court shall be informed immediately.

**35.** Plaintiffs argue that these measures do not protect Fisher from retaliatory attacks by other correction officers on behalf of the defendants. They have failed, however, to present any evidence to support this position. Instead, they rely on the case of *In re Malone,* 105 A.D.2d 455, 480 N.Y.S.2d 603 (N.Y.A.D.3d Dept. 1984). In that case, the court mentioned that there was evidence indicating that it is highly unusual for a correction officer to voluntarily inform upon his or her fellow correction officers for fear of retaliation for breaking the "code of silence" which exists among correction officers. Even if this so-called "code of silence" exists, it does not, as defined in *Malone,* mean that correction officers somehow band together to retaliate against inmates who make allegations against correction officers. In other words, even if *Malone* stands for the proposition that correction officers are reluctant to inform on each other, it does not stand for the proposition that they would retaliate against inmates on each others' behalf. *Malone* simply does not say that and there is no evidence here to suggest such a conclusion.

Fisher's claim that prison officials retaliated against her by tape recording her telephone calls while she was in SHU is equally frivolous. For obvious security reasons, inmate telephone calls are subject to being monitored and tape recorded. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 723.3(c). Captain Sherlock testified credibly that Fisher's calls were being taped so that prison officials could determine whether she had been the subject of any threats from other inmates as a result of either Nieves' allegations that she set up other inmates or her own negative comments about other inmates appearing in the *Times* article.

Fisher's placement in IPC was done for the purpose of protecting her from harm from other inmates, not to retaliate against her. Captain Sherlock testified credibly that he was concerned that inmates would target Fisher for retaliation after Nieves accused her of having set up fellow inmates and after the *Times* article was published containing Fisher's derogatory statements about other inmates. Indeed, as stated above, Fisher had a long history of problems with other inmates resulting from her notoriety and her attitude toward them, and she complained constantly about being threatened by other inmates. Placing Fisher in IPC under these circumstances was certainly reasonable and prudent, and was indicative of the defendant prison officials' attentiveness to Fisher's situation. When Albion prison authorities became aware of a risk of harm from other inmates, they reacted appropriately by removing Fisher from the general population and placing her in a more secure unit. *See Carrigan v. Delaware*, 957 F.Supp. 1376, 1385 (D.Del.1997). Once inmate Nieves was transferred to another prison, and there was no other evidence of possible reprisals by other inmates, Fisher was released from IPC and placed back in the general population. There is no indication whatsoever that Fisher was placed in IPC in order to retaliate against her for her allegations in this case.

Finally, defendants have indicated in their papers, and it has been this Court's experience, that after filing lawsuits against prison officials, inmates often request to be transferred, based on conclusory, uncorroborated and unsupported allegations that they will be subject to retaliation as a result of bringing the lawsuit. Such claims of retaliation are prone to abuse and must be approached with caution. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983). As both Captain Sherlock and Assistant IG Urban testified, transferring prisoners based on uncorroborated allegations against correction officers would wreak havoc on the prison system as any inmate wanting a transfer would simply have to file a lawsuit against a correction officer and then claim that he or she will be subject to retaliation if he or she is not transferred to a different facility.

### C. *Psychological Harm*

▮ Fisher argues that she should be transferred because she will suffer psychological harm if she is forced to remain at Albion where the alleged rapes and sexual abuse took place, and if she is forced to come in contact with the defendant correction officers who allegedly raped her. In support of her argument, Fisher points to Dr. Ciccone's testimony that it would be a tremendous psychological stressor for an individual who has been raped to be forced to come in contact with the rapist or to be forced to return to the scene of the rape.[36] The Court finds, however, that there is currently no risk to Fisher's mental or physical health if she remains at Albion.

Fisher's physical health is good and she has had no psychiatric symptoms since being released from disciplinary confinement in SHU. Dr. Ciccone testified credibly and persuasively that Fisher does not, at this time, suffer from any type of mental or psychological problem, and that her previous depression was solely the result of her isolation in disciplinary confinement. Significantly, both Dr. Ciccone and plaintiffs' own expert, Dr. Ewing, testified that Fisher did not express any fear related to the alleged rapes or about staying at Albion. If in the future Fisher

---

**36.** Expert testimony on this point was probably not necessary. It seems obvious that forcing a rape victim to come in contact with her rapist could cause the victim severe psychological harm and trauma.

develops any psychiatric problems such as depression, treatment is available to her at Albion. To date, she has declined such treatment.

Moreover, as stated above, the Court finds that Fisher's claims of rape and sexual abuse are not credible. Of course, if she was not raped, then there is little or no risk that she will suffer any psychological harm from having to remain at Albion. Further, even if Fisher's allegations are assumed to be true, the defendant prison officials have, as discussed above, taken reasonable and adequate steps to ensure that Fisher has minimal contact with the defendant correction officers. In fact, three of the five correction officers who Fisher alleges raped her no longer even work at Albion. Thus, there is little or no danger that Fisher will suffer psychological harm if she remains at Albion.

### D. *Further Violations of Fisher's First Amendment Rights*

Plaintiffs claim that defendants have irreparably harmed Fisher by punishing her for speaking out, in violation of the First Amendment. More specifically, plaintiffs claim that defendants violated Fisher's First Amendment rights by: (1) punishing her for sending love letters to a correction officer; (2) placing her in disciplinary confinement in retaliation for her statements in the *Times* article and her allegations in this case; and (3) using the content of the *Times* article as a basis for placing her in IPC. The Court finds this claim without merit.

■ Inmates simply do not have a First Amendment right to write love letters to correction officers, and prison authorities certainly have a significant and legitimate interest in prohibiting and punishing such conduct. Thus, punishing Fisher for writing love letters to Sergeant Bailey did not violate her First Amendment rights.

Fisher's claim that she was placed in disciplinary confinement in retaliation for her statements in the *Times* article and her allegations in this case is not supported by the facts in the record. As stated above, Fisher has failed to present any evidence of retaliation. The evidence shows that her placement in disciplinary confinement, and later in IPC, was for legitimate reasons. She was placed in disciplinary confinement for writing the love letters to Sergeant Bailey. She was placed in IPC to protect her from harm from other inmates after Nieves accused her of having set up fellow inmates and after the *Times* article was published containing Fisher's derogatory statements about other inmates. Defendants did not punish Fisher for her statements in the *Times* article; they simply protected her from the possible consequences associated with the article's publication.

■ Finally, even if plaintiffs were able to establish that defendants somehow violated Fisher's First Amendment rights, the relief sought here, *i.e.*, a transfer to another prison, would not be necessary or appropriate. At most, the Court would order defendants to cease and desist from any future violations. Fisher would not have to be transferred in order to prevent the alleged harm.

### III. *Clear or Substantial Likelihood of Success on the Merits*

■ As stated above, in order to succeed on their motion for a mandatory preliminary injunction, plaintiffs must make a clear or substantial showing of a likelihood of success on the merits. Although Fisher alleges myriad violations of her federal and state constitutional, statutory and common law rights, the crux of her complaint is that the defendant correction officers deprived her of her right to be free of cruel and unusual punishment under the Eighth Amendment to the United States Constitution by allegedly raping and sexually abusing her, and that the defendant prison officials, through their deliberate indifference, allowed this deprivation to occur. In *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir.1997), the Second Circuit recently discussed the parameters of an Eighth Amendment sexual abuse claim under § 1983. The court held that sexual abuse of a prisoner by a correction officer may, in some circumstances, violate the prisoner's right to be free from cruel and unusual punishment. *Id.* at 860–61. The court stated:

172

The Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. The "unnecessary and wanton infliction of pain" on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment. An official violates the Eighth Amendment when two requirements are met. First, the alleged "punishment" must be, "objectively, sufficiently serious." Under the objective standard, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Second, the prison official involved must have a "sufficiently culpable state of mind." Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.

\* \* \* \* \* \*

Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm. For this reason, there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison official can be "objectively, sufficiently serious" enough to constitute an Eighth Amendment violation. Moreover, like the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is "simply not part of the penalty that criminal offenders pay for their offenses against society."

\* \* \* \* \* \*

The subjective element of the Eighth Amendment test may also be met by claims of sexual abuse. Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind. It is therefore apparent, even without considering what *mens rea* is necessary to show a "wanton" state of mind for a claim of sexual abuse, that a prison official who sexually abuses a prisoner can be found to have a sufficiently culpable state of mind to violate the prisoner's constitutional rights.

\* \* \* \* \* \*

Accordingly, allegations of sexual abuse may meet both the subjective and objective elements of the constitutional tests, thereby stating an Eighth Amendment claim under Section 1983.

*Id.* (internal citations omitted).

Fisher has failed to establish a clear or substantial likelihood of success on her Eighth Amendment sexual abuse claim. Simply put, after carefully considering the testimony offered at the hearing and the other evidence in the record, the Court finds that Fisher's claims of rape and sexual abuse are not credible. Neither Fisher nor her mother was a credible witness and their testimony was contradicted both by other witnesses, particularly Nieves, and other evidence in the record.

The credibility of Fisher's claims is also undermined by the lack of credibility of her complaint. As stated above, the complaint contains blatantly false and misleading allegations. For example, plaintiffs' descriptions of the telephone calls between defendant Schwartz and Mrs. Fisher as "harassing," "foreboding" and as containing "deliberate threats and intimidation," are totally false and misleading. The integrity of the complaint is also undermined by the inclusion of Correction Officer Zamniak as a defendant. When asked about Zamniak at the hearing, Fisher testified, "I don't even know why he's in this suit or what he did." T. 297. Thus, there appears to have been insufficient investigation of the facts before the complaint was filed.

Fisher's claims of rape are also uncorroborated. Despite being told by plaintiffs' counsel at the initial appearance that plaintiffs had a "safety deposit box" containing all sorts of evidence, plaintiffs presented no evidence to corroborate Fisher's testimony.[37]

37. At the initial appearance, plaintiffs' counsel represented that plaintiffs had in their possession a pair of Fisher's underwear which she claims she was wearing when she was allegedly raped by defendant Kuttner. Counsel represented that the underwear contained semen, which when subjected to DNA testing, would prove to be that of Kuttner. While the alleged pair of underwear

They offered no other witnesses to or physical evidence of the alleged rapes. Plaintiffs appear to contend that the tape recorded telephone calls from Schwartz to Mrs. Fisher somehow corroborate Fisher's claims. The Court disagrees. Although the tapes establish inappropriate conduct on the part of Schwartz, they do not corroborate Fisher's claims of rape.

Plaintiffs argue that the Court must accept as fact Fisher's testimony alleging rape and sexual abuse, because the individual defendant correction officers were not called to the stand by the defendants to refute her allegations. The Court finds this argument without merit. The burden of proving that she is entitled to a preliminary injunction remains at all times on Fisher. It is up to her to convince the Court by a preponderance of the evidence that her allegations of rape and sexual abuse are true. She could have called the individual defendant correction officers to the stand to testify but, with the exception of defendant Schwartz, chose not to do so. There was no requirement on the part of the individual correction officers to take the stand to refute Fisher's allegations. Interestingly, prior to the hearing, plaintiffs moved to have the individual defendant correction officers precluded from participating in the hearing, because, plaintiffs argued, their participation was unnecessary. *See* Item No. 8.

In any event, defendants did, in fact, present evidence refuting Fisher's testimony regarding allegations of rape and sexual abuse. At the hearing, defendant Schwartz denied Fisher's claims that he raped her. Three of the other defendant correction officers submitted affidavits denying Fisher's claims of rape and sexual abuse against them.[38] Further, as stated above, Fisher was cross-examined by defendants' counsel and she was not credible. Nieves testified credibly that Fisher told her that she had a "plan" to make false allegations of rape against correction officers in order to obtain a transfer. Fisher failed to present any evidence to rebut Nieves' testimony. Nieves' testimony is corroborated by prison records that show that Fisher has been attempting to get a transfer to a facility closer to her home since the moment she arrived at Albion. Nieves' testimony is also corroborated by the taped telephone calls between defendant Schwartz and Mrs. Fisher. These tapes reveal plaintiffs' deliberate "plan" to set up Schwartz. On the tapes, Mrs. Fisher encouraged Schwartz to continue calling and to write to Fisher. This "plan" to set up Schwartz is consistent with Fisher's overall "plan" that she described to Nieves to set up correction officers with false accusations of rape in order to effectuate a transfer to a facility closer to home.

Furthermore, even if it is assumed *arguendo* that Fisher's hearing testimony was credible, she still has not established a clear or

---

was listed as an exhibit on plaintiffs' exhibit list, plaintiffs chose not to produce the underwear for inspection by the defendants prior to the hearing, in violation of the Court's Scheduling Order of August 27, 1996. Item No. 26. Accordingly, the Court precluded plaintiffs from offering the underwear into evidence at the hearing. The Court has not been informed of any subsequent DNA test results. Even if DNA testing was to determine that the semen on the underwear belongs to Kuttner and that Fisher's DNA is also on the underwear, such evidence would, at the most, show that Kuttner and Fisher may have had sexual relations. Such evidence would not, by itself, indicate that such relations were nonconsensual.

At the initial appearance, plaintiffs' counsel also told the Court that plaintiffs possessed suggestive photographs of Fisher taken by a correction officer at Albion. However, as discussed *supra* note 9, this alleged evidence was not listed on plaintiffs' exhibit list and was not produced at the hearing.

Plaintiffs apparently made a strategic decision to withhold this evidence—the underwear and the pictures—from the Court. However, the Court can only decide this case based on the evidence before it and cannot guess or speculate as to the existence of other evidence.

**38.** *See Federal Sav. & Loan Ins. Corp. v. Dixon,* 835 F.2d 554, 558 (5th Cir.1987) (court may consider affidavits and other hearsay evidence at preliminary injunction stage); *Jones v. Bowman,* 694 F.Supp. 538, 549 (N.D.Ind.1988) (on motion for preliminary injunction, court may consider the entire record, including affidavits); *Animal Fair, Inc. v. AMFESCO Indus.,* 620 F.Supp. 175, 184 n. 12 (D.Minn.1985) (the court has discretion on a preliminary injunction motion to consider affidavits as well as live testimony, given the necessity of a prompt decision), *aff'd,* 794 F.2d 678 (8th Cir.1986).

substantial likelihood of success on the merits with respect to a number of the individual defendant correction officers.[39] On her claims of rape under § 1983, Fisher has the burden of showing lack of consent. *Lyons v. Williams,* 91 F.3d 1308, 1311(9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 949, 136 L.Ed.2d 837 (1997). Fisher's own testimony about her sexual relationships with defendants Schwartz, Hemley and Kuttner can only reasonably be interpreted as showing that the relationships were consensual in nature. While testifying, Fisher never used the word "rape" to describe her sexual interactions with these defendants.[40] In contrast, she expressly stated that defendants DiSalvo and Schmidt "raped" her.[41] Further, she presented no evidence that either Schwartz, Hemley or Kuttner forced, threatened or coerced her to have sex. She admitted that she did not resist them or tell them no. She testified that she had sexual relations with Schwartz and Hemley on several occasions and described each of them as a "friend." She indicated that she ended her sexual relationship with Schwartz, not because he raped or abused her, but because she "didn't miss him" when she was at Bedford Hills. Although, as stated above, Fisher's prison records indicate that she was never hesitant or afraid to complain to prison officials about perceived mistreatment by correction officers, she did not report her alleged sexual interactions with these defendants until months after they occurred, and she testified that she had sexual relations with Hemley even after she had reported him. Thus, with regard to Schwartz, Hemley and Kuttner, Fisher has failed to show lack of consent, even if her testimony is assumed to be true.

This case is similar to the recent case of *Freitas v. Ault,* 109 F.3d 1335, 1339 (8th Cir.1997). In *Freitas,* a male inmate brought a § 1983 action against a warden and a female prison employee, alleging that he was sexually harassed by the employee in violation of the Eighth Amendment. After a bench trial, the district court found that the sexual relationship between the inmate and the employee was consensual and therefore the inmate failed to establish his Eighth Amendment sexual harassment claim. In affirming the district court, the Eighth Circuit agreed with the district court's factual determination that the relationship between the inmate and the employee was consensual, and noted that the record contained no evidence, other than the inmate's unsubstantiated assertions, supporting his claim that he succumbed to the employee's advances because she was his boss and he feared the possible negative consequences of reporting her actions. The circuit court concluded that, because the sexual interactions between the inmate and the employee were consensual, there was no violation of the Eighth Amendment.

■ Applying *Freitas* to the instant case, the Court finds that, even if Fisher's testimony had been found credible, Fisher failed to establish an Eighth Amendment violation with regard to defendants Schwartz, Hemley and Kuttner. As stated above, Fisher's own description of her alleged sexual relationships with these individuals shows that they were consensual. Under *Freitas,* consensual sexual interactions between a correction officer and an inmate, although unquestionably inappropriate, and in this Court's view despicable, do not constitute cruel and unusual punishment under the Eighth Amendment.

■ Plaintiffs argue that there exists a "power discrepancy" between a correction

---

**39.** Fisher testified that she had sexual relations with five defendant correction officers. She described consensual sexual relations with defendant Schwartz two or three times in the summer of 1993. She described consensual sexual relations with defendant Hemley three times in the fall of 1993. She described nonconsensual intercourse with defendant DiSalvo on one occasion on October 14, 1994. She described consensual sexual relations with defendant Kuttner on one occasion on July 26, 1995. She described non-consensual sodomy and intercourse with defendant Schmidt on April 8, 1996.

**40.** Mrs. Fisher testified that Fisher also did not use the word "rape" when she was describing to Mrs. Fisher her sexual relationship with Schwartz in the summer of 1993.

**41.** In light of the Court's credibility determinations, plaintiffs have not established a clear or substantial likelihood of success on their claims against these two defendants.

officer and an inmate, making it impossible for an inmate to ever truly consent to having sexual relations with a correction officer. While the Court agrees that a correction officer's position of authority over an inmate is a factor that should be considered when determining, factually, whether or not there was consent, plaintiffs have cited no case law or applicable statutory authority to support the proposition that an inmate may never, as a matter of law, consent to sexual relations with a correction officer. Indeed, the Eighth Circuit, in *Freitas*, clearly held that an inmate may consent to sexual relations with a prison employee. Here, there is no credible evidence that either Schwartz, Hemley or Kuttner used their positions as correction officers to force, threaten or coerce Fisher into having sex.

Of course, as stated above, it is now the law in New York that sexual relations of any kind between an inmate and a correction officer constitute statutory rape. N.Y. Penal L. § 130.05(3)(e). This law was not in effect, however, at the time of the alleged misconduct in this case. Indeed, the fact that it was necessary to enact such a law, combined with the lack of evidence of any prior prohibition, would indicate that, before the new law's passage, an inmate could, as a matter of law, consent to sexual relations with a correction officer.

The wisdom of this new law is manifest. It draws a "bright line" between acceptable and unacceptable conduct. Sexual interactions between correction officers and inmates, no matter how voluntary, are totally incompatible with the order and discipline required in a prison setting. Further, the Court is disturbed by the notion that an inmate might feel compelled to perform sexual favors for correction officers in order to be on the officer's "good side." Such *quid pro*

*quo* behavior is inappropriate, despicable and serves no legitimate penological purpose.

■ The Court further finds that Fisher's allegations against defendant Thomas, even if assumed to be true, do not rise to the level of an Eighth Amendment violation. Fisher testified that, on several occasions Thomas stroked her hair while she was sleeping and that he once gave her an unsolicited kiss. Again, while such conduct, if true, is clearly inappropriate and unacceptable, it does not rise to the level of an Eighth Amendment violation.[42] *See Boddie*, 105 F.3d at 861 (inmate's claims that he was verbally harassed, touched and pressed against without his consent on a small number of occasions did not involve a harm of federal constitutional proportions); *Kaestner v. Mitchell*, 1996 WL 428357 (N.D.Cal. July 24, 1996) (inmate's allegation that defendant stood closer to inmate than necessary and on one occasion grabbed his buttocks did not rise to the level of an Eighth Amendment violation); *Duncan v. Keane*, 1995 WL 649931 (S.D.N.Y. Nov.6, 1995) (complaint that guard sexually harassed inmate by feeling all over the inmate's buttocks dismissed for failure to state a claim). Nor do Fisher's allegations that she was verbally harassed by several of the defendant correction officers state a claim under the Eighth Amendment. *Adkins v. Rodriguez*, 59 F.3d 1034, 1037 (10th Cir.1995); *Young v. Coughlin*, 1996 WL 451411 (S.D.N.Y. Aug.8, 1996).[43]

The Court notes that it frequently receives requests for injunctive relief from prison inmates, especially requests for transfers from one prison to another. The majority of these requests are frivolous, and are resolved on the papers without a hearing. The Court held a hearing in this case, however, because the allegations of rape and sexual abuse stated in the complaint are extremely serious,

**42.** It is also questionable whether Fisher has stated an Eighth Amendment claim against defendant Shimley. Shimley allegedly: (1) showed Fisher naked pictures of himself; (2) called her names; (3) exposed himself; (4) tried to write on her arm with a marker; (5) grabbed and twisted her breast on one occasion; and (6) kicked her in the shin on one occasion. While such conduct is obviously inappropriate and wrong, the Court will not rule, at this time, whether it is "sufficiently serious" to constitute an Eighth Amend-

ment violation within the parameters established in *Boddie*, 105 F.3d at 860–61.

**43.** In their papers, plaintiffs assert numerous other arguments and claims under the Fourth, Fifth, Thirteenth, and Fourteenth Amendments. The Court has carefully considered all these arguments and finds them without merit for purposes of the instant motion.

and because plaintiffs' counsel represented to the Court that plaintiffs had substantial corroborating proof to support their claims. Rape or sexual abuse of inmates by correction officers is abhorrent and cannot be tolerated or condoned. Prison officials must be diligent in preventing such misconduct and punishing those who transgress. Nevertheless, in this case, Fisher's allegations of rape and sexual abuse do not bear up under close scrutiny. Unfortunately, it appears that she and her mother are trying to manipulate the system by capitalizing on this sensitive and important issue.

The Court further notes, however, that its decision here should not be viewed as a ringing endorsement of the situation at Albion. Despite the Court's determination that Fisher's claims of rape and sexual abuse are not credible, there are indications that all is not right at Albion. For example, defendant Schwartz' admitted misconduct was certainly a serious breach of acceptable behavior, and the light punishment he apparently received, i.e., a transfer, would seem to send the wrong message to other correction officers. It was also clearly inappropriate for prison officials to have allowed television cameras into Fisher's living area. Further, Nieves indicated during her testimony that voluntary sexual interactions between inmates, and between inmates and corrections officers, are common at Albion. She further mentioned that some male correction officers grope inmates while frisking them. Nieves also indicated that drug use by inmates is not unusual and that drugs flow freely into Albion. The Court cannot stress enough how important it is for the defendant prison officials to investigate fully and thoroughly these matters and to take immediate and appropriate remedial action, where required.

## IV. Requested Relief Inappropriate

Plaintiffs request that Fisher be transferred from Albion to the custody of FBP at Danbury, or in the alternative, that she be transferred to another facility in the DOCS system or in another state. The Court finds that the requested relief is inappropriate for two reasons: (1) the Court lacks authority to order FBP to accept and maintain custody over a state inmate, such as Fisher; and (2) even if the Court were to determine that defendants violated Fisher's federal rights, the Court would have to afford the State of New York and the defendant prison officials an opportunity to correct its own errors and present a proposal for relief, before granting any injunctive relief.

## A. The Court Lacks Authority to Order Placement of a State Prisoner Into the Custody of FBP

■ Fisher is serving a duly imposed state sentence under the custodial authority of DOCS. She is not subject to any type of federal sentence. This Court lacks jurisdiction to order FBP to accept Fisher into federal custody.

It is well settled that a prisoner has no constitutional right to serve a sentence in any particular institution or to be transferred or not transferred from one facility to another. *Olim v. Wakinekona*, 461 U.S. 238, 249–50, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983); *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976); *Pugliese v. Nelson*, 617 F.2d 916, 922 (2d Cir.1980).

■ Even when a defendant receives a federal sentence, a district court "has no authority to order that a convicted defendant be confined in a particular facility, much less placed in a particular treatment program; those decisions are within the sole discretion of the Bureau of Prisons." *United States v. Williams*, 65 F.3d 301, 307 (2d Cir.1995). Likewise, when a state has primary custodial jurisdiction over an inmate, a federal court cannot order the delivery of the defendant for service of a sentence in a federal institution. Such an order would be tantamount to a transfer of custody beyond the jurisdiction of the federal court. *United States v. Warren*, 610 F.2d 680, 684–85 (9th Cir.1980).

In this case, there is no question that the plaintiff is under the primary custodial jurisdiction of the New York State. She is incarcerated solely on the basis of a state sentence, the legality of which is not before this Court. Accordingly, this Court has no authority to order FBP to accept custody of Fisher.

In support of her position, Fisher cites to the case of *Walker v. Lockhart,* 713 F.2d 1378 (8th Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2168, 80 L.Ed.2d 552 (1984). In *Walker,* the plaintiff-inmate brought a civil rights and habeas corpus action against prison officials, alleging that his confinement within the Arkansas penal system violated the Eighth Amendment prohibition against cruel and unusual punishment. The Eighth Circuit held that the uncontradicted evidence of the inmate's notoriety and his claim that a former warden had threatened him indicated that he would face increased danger in the State's prison system if he were allowed to mix with the system's general population, because he was an inviting target for any disgruntled prisoner who wanted to embarrass prison authorities. Therefore, the court held, he was entitled to serve the remainder of his sentence in another jurisdiction where he would be granted the same privileges and amenities as any other prisoner. The Eighth Circuit remanded the case to the district court for entry of an order requiring the Arkansas prison authorities to transfer the inmate to a place of incarceration outside of Arkansas, "either in a federal or another state's correctional institution." *Id.* at 1383.

The Court finds *Walker* distinguishable on two grounds. First, the ruling in *Walker* was based on that court's finding that no facility within the State of Arkansas could safely house the inmate. *Id.* at 1383. Such a claim has not been made here and there has been no evidence that Fisher cannot be housed safely in another correctional facility within the DOCS system. Second, the *Walker* court directed that the State of Arkansas provide for the transfer of the inmate to another jurisdiction. The Court did not order FBP to accept the inmate. Thus, *Walker* does not stand for the proposition that a federal court may order FBP to accept a state inmate into its custody.[44]

### B. *The Court Must Afford New York State the Opportunity to Correct the Situation*

■ Even if the Court were to find that defendants violated Fisher's constitutional rights, the Court would not immediately grant the relief requested by Fisher, *i.e.,* a transfer to another prison. "Even where there has been a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators." *Taylor,* 34 F.3d at 269 (citations omitted). "[F]ederal judicial intervention in the details of prison management is justifiable only where state officials have been afforded the opportunity to correct constitutional infirmities and have abdicated their responsibility to do so." *Id.* This is especially true when mandatory injunctive relief is sought and only preliminary findings as to the plaintiff's likelihood of success on the merits have been made. *Id.*

In *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Supreme Court recently addressed the proper method for fashioning injunctive relief in prison cases. In *Lewis,* the Court reversed an injunction that did not afford state prison officials the opportunity to correct their own errors. *Id.* at ——-——, 2185–86. The process set forth by the Court requires that the district court find an injury first, then afford prison officials an opportunity to devise and present an appropriate remedy for judicial review. *Id.* Citing its decision in *Preiser v. Rodriguez,* 411 U.S. 475, 492, 93 S.Ct. 1827, 1837–38, 36 L.Ed.2d 439 (1973), the Court stated that "[t]he strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors ... also require giving the States the first opportunity to correct errors made in the internal administration of their prisons." *Id.* at ——, 2185.

Similarly, in this case, even if the Court were to find that defendants violated Fisher's constitutional rights, the Court would, pursuant to *Lewis,* afford the defendant prison officials an opportunity to correct their own errors and present a proposal for relief to

---

**44.** There is no indication that the federal government ever appeared in the *Walker* case to argue that the federal court lacked jurisdiction to order FBP to accept the state inmate.

this Court before granting any type of injunctive relief to plaintiffs.[45]

## V. *Amendment of Complaint*

The complaint in this case is 94 pages long and contains approximately 396 numbered paragraphs. It is written in a rambling, "scatter shot" manner and, at times, reads more like a cheap dime store novel or a script for a tabloid television show than a pleading in a federal lawsuit. Even more problematic is the fact that it contains numerous false, misleading, irrelevant, highly inflammatory and prejudicial statements and allegations. *See, e.g.,* Complaint at ¶¶ 4–7, 35–37, 46–53, 59, 68, 81–86, 95, 107–113, 143–48, 151–54, 191–93, 258–59, 274, 282(b), 283(a), 285–86, 290, 291–301, 312, 317, 319–20, 343, 350–51, 358, 372 and 378. As stated above with regard to Correction Officer Zamniak, there is every indication that counsel did not adequately research and investigate the facts and claims in this case before filing the complaint.

Accordingly, pursuant to Fed.R.Civ.P. 12(e) and (f), the Court hereby orders plaintiffs to submit an amended complaint striking all false, misleading, redundant, irrelevant, immaterial, impertinent, inflammatory, prejudicial and scandalous material from the original complaint, and eliminating all frivolous and unsupported or unsupportable claims. Along with the amended complaint, plaintiffs and their counsel shall each file an affidavit certifying that they have investigated the matter and the representations and allegations in the amended complaint are true and accurate to the best of their knowledge. Failure to comply with this requirement may result in dismissal of the case and/or sanctions pursuant to Fed.R.Civ.P. 11; 28 U.S.C. § 1927; and/or the Court's inherent power.

## CONCLUSION

For the reasons stated, plaintiffs' motion for a preliminary injunction is denied. Plain-

tiffs shall file an amended complaint in accordance with this decision by August 15, 1997. Defendants shall respond to the amended complaint by answer or motion by September 15, 1997.[46] The Court shall refer the case to Magistrate Judge Carol E. Heckman for supervision of all nondispositive pretrial matters. Due to its familiarity with the case, the Court shall hear and decide all dispositive motions.

IT IS SO ORDERED.

---

**45.** Indeed, without admitting fault, the defendant prison officials have taken steps to ensure Fisher's safety and to protect her from any future instances of possible harassment or abuse by the defendant correction officers.

**46.** Because the Court is ordering plaintiffs to file an amended complaint, the motions to dismiss filed by the defendant prison officials, Item Nos. 12 and 24, are hereby denied, without prejudice.